2008 WY 114

**Kent Alan PROFFIT, Sr., Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. S–07–0257.

Supreme Court of Wyoming.

Sept. 30, 2008.

See also 191 P.3d 963, 191 P.3d 974.

Representing Appellant: Diane M. Lozano, State Public Defender; Tina N. Kerin, Appellate Counsel. Argument by Ms. Kerin.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Graham M. Smith, Assistant Attorney General. Argument by Mr. Smith.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

VOIGT, Chief Justice.

[¶ 1] The appellant raises five issues in the appeal of his conviction on eight counts of third-degree sexual assault.[1] Finding numerous prejudicial errors in the proceedings below, we reverse and remand for a new trial.

## ISSUES

[¶ 2] 1. Did plain error occur when a State witness testified that the appellant refused to take a polygraph test and terminated the interview by asking for an attorney?

2. Did plain error occur when the prosecutor committed misconduct by:

a. Cross-examining the appellant by asking whether other witnesses were lying?

b. Cross-examining the appellant by improper use of prior convictions, in violation of W.R.E. 609?

c. Shifting the burden of proof to the appellant during rebuttal closing argument?

3. Did the appellant's trial attorney provide ineffective assistance of counsel by:

a. Failing to make appropriate objections?

b. Inviting prejudicial error by inquiring into the investigators' opinions as to the appellants' credibility?

c. Failing to demand notice of uncharged misconduct evidence, and failing to object to the introduction of uncharged misconduct evidence?

4. Did plain error occur in the district court's response to a jury question?

5. Is the record on appeal incomplete?

## FACTS

[¶ 3] On July 2, 2005, a teenaged boy whom we will identify as B.C. reported to the Campbell County Sheriff's Office that he had repeatedly been sexually abused by the appellant, his step-father. During subsequent questioning by law enforcement officers, the appellant declined an offer to take a polygraph test and terminated the questioning by invoking his right to counsel. The appellant later was arrested and charged with eight counts of third-degree sexual assault. He was released on bond pending trial.

[¶ 4] B.C. was murdered about three weeks before the scheduled trial. Eventual-

---

1. *See* Wyo. Stat. Ann. §§ 6-2-304(a)(i) and 6-2- 306(a)(iii) (LexisNexis 2005).

ly, the appellant and several of his acquaintances—Jacob Martinez, Christopher Hicks, and Michael Seiser—were convicted of various homicide crimes as a result of B.C.'s murder. Jacob Martinez admitted shooting B.C. in the head while B.C. slept. The appellant was convicted of conspiring to commit first-degree murder. His conviction for that crime was affirmed by this Court in *Proffit v. State,* 2008 WY 102, 191 P.3d 963 (Wyo. 2008).[2]

[¶ 5] The case now before this Court was tried in Hot Springs County, beginning on June 25, 2007, after the district court granted the appellant's motion for a change of venue. The jury found the appellant guilty of all eight counts. The district court sentenced the appellant to consecutive terms of imprisonment for ten to fifteen years on each count, and later denied a motion for a new trial. This appeal followed.

## DISCUSSION

*Did plain error occur when a State witness testified that the appellant refused to take a polygraph test and terminated the interview by asking for an attorney?*

[¶ 6] Deputy Sheriff Tony Seeman interviewed the appellant after he was arrested. At trial, the following series of questions and answers occurred during the State's direct examination of Deputy Seeman:

Q. Did you revisit the subject of the sexual assault allegations?

A. Yes, I did.

Q. How did those come up?

A. We just continued. We continued with the interview. Like I said, Kent Proffit, Sr. continued to deny any of this type of activity. I asked Mr. Proffit if he would be willing to take a polygraph test, a lie detector test to broach the subject of the sexual assaults. He thought about that only momentarily and then stated that he would not take a polygraph test.

Q. Did he provide an explanation for you as to why he was reluctant to [do] that?

A. I asked him the question of if he did take a polygraph test what he thought it would reveal or what he thought it would say. At that time he told me that he was scared of a polygraph test, that it may become confused based on Kent Proffit, Sr. being molested as a child by a neighbor.

He was concerned that the polygraph exam may confuse some of his homosexual behavior as he was molested as a child with any questions that he would be asked about the inappropriate behavior with [B.C.].

Q. After learning that, what happened?

A. After learning that—it was shortly after that that Kent Proffit, Sr. looked directly at myself and directly at Sergeant Leet and asked if we actually believed that he had done these things.

Q. Do you recall specifically what he said to you?

A. I may have quoted it in my report. I can't remember if I put it in quotations or not. Actually, that part is in Sergeant Leet's report.

Q. Okay. Do you recall?

A. I have that here also.

Q. Do you recall what it was that Mr. Proffit asked? Let me back up a step. Did he ask one question to the two of you collectively?

A. No. He asked us each separately if we believed that this happened.

Q. Okay. Did he ask you first or second?

A. I can't remember. To be honest, I can't remember if I was first or second. He asked both of us though.

Q. When he asked you that question, what did you tell him?

A. I told him that, yes, I believe he had possibly had done this thing.

Q. Then what happened?

A. He went—both Sergeant Leet and myself both stated that we believed that he had done this—that he decided to terminate the interview. He said that he want-

---

2. The appellant's convictions for first-degree murder and conspiracy to commit first-degree murder in a tangentially related second mur-der—that of Jeremy Forquer—also were affirmed by this Court in *Proffit v. State,* 2008 WY 103, 191 P.3d 974 (Wyo.2008).

ed an attorney so we stopped the interview and Kent Proffit, Sr. was placed under arrest by Sergeant Leet for breach of peace.[3]

■ [¶ 7] Because there was no trial objection to this testimony, we must review it for plain error. To prove plain error, an appellant must show (1) that the record is clear as to the incident alleged as error; (2) that a clear and unequivocal rule of law was violated in a clear and obvious, not merely arguable, way; and (3) that the error adversely affected a substantial right resulting in material prejudice to him. *Gabbert v. State,* 2006 WY 108, ¶ 11, 141 P.3d 690, 695 (Wyo.2006). There is no dispute that the first element has been shown.

■ [¶ 8] There also can be little dispute that Wyoming adheres to the rule that it is error for the State to introduce evidence that a defendant has refused to take a polygraph or "lie detector" test. *Schmunk v. State,* 714 P.2d 724, 732–33 (Wyo.1986). The rationale for that rule has been stated as follows:

> " 'The impact upon the minds of the jurors of a refusal to submit to something which they might well assume would effectively determine guilt or innocence, under these conditions, might well be more devastating than a disclosure of the results of such test * * *.' "

*Id.* (quoting *Mills v. People,* 139 Colo. 397, 339 P.2d 998, 999 (1959)). Beyond that, we have characterized the introduction of such evidence as "overzealous prosecution":

> "All too frequently this court is compelled to reverse judgments of guilt in important criminal cases because of overzealous prosecution. It is the duty of prosecuting officers to guard against the introduction of incompetent evidence. Overprosecution of an accused should not be permitted by the trial court. In the instant case the district attorney insisted at great length upon introduction into evidence of testimony [refusal to take a lie detector test] which is uniformly held to be

incompetent, in an unbroken line of authorities throughout the nation."

*Id.* (quoting *Mills,* 339 P.2d at 999–1000). The constitutional underpinning for this rule is that it is fundamentally unfair to assure a suspect that he has a right to remain silent, and then to use his exercise of that right against him. *State v. Gutierrez,* 142 N.M. 1, 162 P.3d 156, 162 (2007).

■ [¶ 9] In its Brief, the State contends that this "brief reference" to the polygraph was nothing more than a "logical, narrative transition offered to give context to Appellant's decision to end his interview with the deputies...." That, however, is not the full context in which this testimony must be evaluated. The broader context is the multitude of errors that will be discussed in this opinion. But even the more narrow context— that of the interrogation, itself—is troubling because it includes not only this improper discussion, which was much more than a "brief reference," but it also includes improper declarations as to the officers' opinions that the appellant was guilty, plus comment upon the appellant's exercise of his right to counsel. Furthermore, evidence that the appellant was molested as a child could have suggested to jurors that he, too, became a molester. The prejudicial effect of this exchange was exacerbated during Deputy Seeman's cross-examination when, in response to a question about how the "time lines" of the case were established, he responded as follows:

Q. What did you decide needed to be done?

A. We decided that we needed to just give the best approximations as could be given by [B.C.] who was the one person who could give us the most information. The information that we would have liked to get from another person would have been Kent Proffit, Sr. who was no longer available. So we just had to go with the best approximations that we had.

This statement was clearly another comment upon the appellant's exercise of his right to silence, and was not invited by defense coun-

---

**3.** The appellant had been contacted at a convenience store because of an incident occurring there. It was that incident that led to the arrest for breach of peace.

sel, because it was not necessary information for answering the question.

[¶ 10] Deputy Seeman said enough about what the appellant would not say to render his testimony an improper comment upon the appellant's exercise of his right to silence. And it is significant that much of the offending testimony was directly elicited by the prosecutor, rather than being inadvertent. *See Hernandez v. State,* 2007 WY 105, ¶ 38, 162 P.3d 472, 481–82 (Wyo.2007). Furthermore, even without the constitutional dimension, *Schmunk* teaches us that it is improper to admit evidence of the refusal to take a polygraph as evidence of consciousness of guilt. *Schmunk,* 714 P.2d at 732.

[¶ 11] Often, we find error in a situation such as this but we do not reverse the conviction because there is little likelihood that the verdict would have been more favorable to the appellant absent the error. In this case, however, the State's evidence was fairly meager, being limited to three essentially hearsay witnesses. Under these circumstances, we cannot say that the above-described transgressions did not contribute to the verdict. The case was largely a credibility contest between the appellant and an absent witness. The testimony about the refused polygraph and the appellant's exercise of his right to silence and his right to counsel was simply too fundamental to the central issue to be considered harmless.

***Did plain error occur when the prosecutor committed misconduct by: (a) cross-examining the appellant by asking whether other witnesses were lying; (b) cross-examining the appellant by improper use of prior convictions, in violation of W.R.E. 609; or (c) shifting the burden of proof to the appellant during rebuttal closing argument?***

### Cross–Examination as to Whether Other Witnesses Lied

[¶ 12] The appellant raises the issue of improper questioning techniques in regard to the questioning of his expert witness and in regard to his own cross-examination. One of the State's witnesses was Dr. William Heineke, a licensed psychologist and licensed professional counselor specializing in the field of child sexual abuse. Dr. Heineke assessed and counseled B.C., at the request of B.C.'s mother, between the time B.C. reported the alleged sexual molestation and the time he was killed. Dr. Heineke testified at some length about his sessions with, and evaluation of, B.C.

[¶ 13] The appellant countered Dr. Heineke's testimony with the testimony of Dr. Rayna Rogers, a board-certified general psychiatrist, child adolescent psychiatrist, and forensic psychiatrist. During cross-examination, the following exchange took place between the prosecutor and Dr. Rogers:

Q. Okay. Do you have any—you were in the courtroom yesterday when Dr. Heineke testified?

A. I was.

Q. Did you see all of his testimony?

A. Yes, I did.

Q. Okay. Do you have any reason to believe that he was lying about anything?

A. Can you define what you mean by lying?

Q. Well, when he took the witness stand and he testified under oath that when he first had contact with [B.C.] he made no assumptions. He made no conclusions about what he was going to find out and he started with a blank slate. Do you have any reason to believe that was a lie?

A. I'm afraid it's worse than that. I think he simply did not understand the issue. So whether he was telling the truth or a lie doesn't matter, he simply didn't get it.

[¶ 14] The appellant testified in his own defense. During cross-examination, the prosecutor asked the appellant about the testimony of several witnesses in two earlier trials involving the Forquer murder and B.C.'s murder. This exchange followed those questions:

Q. And in those two trials, just like this trial, the only person in any of those trials that ever told the truth was you?

A. I didn't make any comments, [Prosecutor].

Q. No, but I'm saying today your comments about those two trials was Mr. Mar-

tinez' and Mr. Seiser's when they testified about all those events and your involvement they were lying?

. . . .

Q. Based upon your observations about what happened in the first two trials and the allegations that [B.C.] communicated to this man right here and to a professional counselor that he went and saw, the only person who has told the truth in all of these proceedings is you?

A. Well, [Prosecutor], I wish they would have tape recorded the conversation because—

Q. Mr. Proffit—

A.—you leave out—

Q.—can you answer yes or no?

A. I have not lied to you in this courtroom.

Q. So the only person in this whole big mess where two people are dead and there's a kid that says you molested him and who is telling the truth is you?

A. Yes, [Prosecutor].

[¶ 15] There were no trial objections to this line of questioning, so we review for plain error under the above-outlined standard. The first factor is satisfied because the trial transcript clearly provides a record of what transpired. As to the second factor—the violation of a clear and unequivocal rule of law—we quote at length our holding in *Jensen v. State*, 2005 WY 85, ¶ 20, 116 P.3d 1088, 1095–96 (Wyo.2005):

> Turning to the prosecutor's cross-examination of Jensen, we note, generally, that a defendant who testifies in a criminal case may be cross-examined regarding his credibility just like any other witness. *Gist v. State*, 766 P.2d 1149, 1152–53 (Wyo.1988); *MacLaird v. State*, 718 P.2d 41, 47 (Wyo. 1986); *Porter v. State*, 440 P.2d 249, 250 (Wyo.1968). In *Beaugureau [v. State*, 2002 WY 160, 56 P.3d 626 (Wyo.2002)], however, we observed that there was a limit to the cross-examination of a criminal defendant:
>
> > Nonetheless, it is likewise error and misconduct for the prosecutor to cross-examine a defendant using the "lying" or "mistaken" technique (*i.e.*, well, then if "so-and-so" said "such-and-such," was he "mistaken" or "lying?"). Such questions are improper. If the prosecutor merely asked Beaugureau about what other witnesses had to say, allowing the jury to draw its own conclusions, the cross-examination would not have been objectionable. *State v. Diggs*, 272 Kan. 349, 34 P.3d 63, 72–73 (2001); *State v. Manning*, 270 Kan. 674, 19 P.3d 84, 100–3 (2001) ("Questions which compel a defendant or witness to comment on the credibility of another witness are improper. It is the province of the jury to weigh the credibility of the witnesses." (collecting cases)); *State v. Stevenson*, 70 Conn. App. 29, 797 A.2d 1, 7–9 (2002) (Such questions are improper because they "require a defendant to comment on another witness' veracity ... invade the province of the jury, create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the other witnesses lied, and distort the state's burden of proof.") (relying on *State v. Singh*, 259 Conn. 693, 793 A.2d 226, 234–39 (2002)) (collecting cases); *also see State v. Walden*, 69 Wash.App. 183, 847 P.2d 956, 959 (1993); and *State v. Pitts*, No. 47488–0–1, 2001 WL 1641225 at *4 (Wash.App. Div. 1, Dec.24, 2001) (per curiam) (use of word "lying" is misconduct; use of word "mistaken" merely objectionable).
>
> *Beaugureau*, ¶ 17. The reasoning for prohibiting this type of questioning was succinctly summarized by the Iowa Supreme Court:
>
> > [A] defendant who is asked whether another person lied is commenting directly on the other person's credibility.
> >
> > The issue then is whether any purpose is served in asking a defendant whether another witness is lying. We think the predominate, if not sole, purpose of such questioning is simply to make the defendant look bad, as implied by the Maryland court's observation in *[Fisher v. State*, 128 Md.App. 79, 736 A.2d 1125, 1163 (1999) ] that the accused's answer is unimportant. * * * The accused's answer is unimportant because the accused is in a no-win situation. If the defendant says the other wit-

ness *is* lying, then the defendant is put in the position of calling someone a liar, a particularly unenviable state when the other witness is a law enforcement officer. See [*State v. Emmett*, 839 P.2d 781, 787 (Utah 1992)] (holding such questions are improper because they put "the defendant in the untenable position of commenting on the character and motivations of another witness who may appear sympathetic to the jury"). If the defendant says a contradictory witness is *not* lying, then a fair inference is that the *defendant* is lying.

But, as any trial lawyer knows, there may be many explanations for differing descriptions of the same event. People have different perceptions of the same conversation that affect how and what they remember. Perhaps there was a misunderstanding of what was said; perhaps one person was distracted and did not fully or correctly hear the words uttered by the other person. People sometimes hear what they want to hear. It is unjust to make the defendant give an opinion as to who is lying when, in fact, it is possible that neither witness has deliberately misrepresented the truth. It is also unreasonable to expect the defendant to sift through the variables of human communication to offer an alternative explanation for contradictions in witnesses testimony.

We also think the use of this tactic—asking the defendant whether another witness is lying—is incompatible with the duties of a prosecutor. Unfairly questioning the defendant simply to make the defendant look bad in front of the jury regardless of the answer given is not consistent with the prosecutor's primary obligation to seek justice, not simply a conviction. Nor is such questioning consistent with the prosecutor's duty to the defendant to ensure a fair trial, including a verdict that rests on the evidence and not on passion or prejudice. [*State v. Casteneda–Perez*, 61 Wash.App. 354, 810 P.2d 74, 79 (Wash. Ct.App.1991)] (holding prosecutor's questions asking witnesses whether other witnesses were lying was "contrary to the duty of prosecutors, which is to seek convictions based only on probative evidence and sound reason").

*State v. Graves,* 668 N.W.2d 860, 872–73 (Iowa 2003) (emphasis in original) (footnotes omitted).

■ [¶ 16] The admonition against asking the appellant whether other witnesses lied applies equally to asking any witness whether another witness has lied. *State v. Manning,* 270 Kan. 674, 19 P.3d 84, 100–01 (2001). That is because such questions invade the province of the jury to determine witness credibility. *Id.* The State clearly violated an unambiguous rule of law by asking both the appellant and Dr. Rogers whether other witnesses had lied. The violation was more egregious during the cross-examination of the appellant, where there were many such questions.

■ [¶ 17] The third step in our plain error analysis of this issue is to ask whether the appellant was materially prejudiced. In his Brief, the appellant identifies the resultant prejudice as violation of the prosecutor's duty to ensure a fair trial by attempting to inflame the jury, and by putting the appellant and the jury in the position of having to decide who was lying. The State counters with the argument that, by taking the stand and purporting to give the jury the full truth, as opposed to what the earlier juries in the related cases had heard, the appellant invited this line of questioning.

[¶ 18] We previously have held that an appellant "cannot 'open the door' to the type of improper questioning used by the prosecutor," but that an appellant's "invitation or instigation is a relevant consideration in assessing the prejudice element." *Talley v. State,* 2007 WY 37, ¶ 15, 153 P.3d 256, 261 (Wyo.2007). We went on in *Talley,* 2007 WY 37, ¶ 16, 153 P.3d at 262, to describe the factors to be weighed in evaluating the prejudice caused by the "were-they-lying" technique:

1) the severity and pervasiveness of the misconduct; 2) the significance of the misconduct to the central issues in the case; 3) the strength of the State's evidence; 4) the use of cautionary instructions or other

curative measures; and 5) the extent to which the defense invited the misconduct.

[¶ 19] On their face, especially in light of defense counsel's apparent trial strategy—which was to convince the jury that (1) the witnesses in the two murder trials all lied and (2) the appellant would clear it all up by testifying as to the truth in this case—these instances of the "lying" cross-examination technique would not, standing alone, constitute reversible error. This case is, in fact, quite similar to *Talley*, where we found that prejudice sufficient to require reversal had not been shown. *Id.*, 2007 WY 37, ¶ 17, 153 P.3d at 262. On the other hand, the State's case was weak, consisting as it did of only three hearsay witnesses, and the misconduct went to the very heart of the case, which was a credibility contest between the appellant and B.C. By bringing in the testimony from the other trials, and quizzing the appellant as to whether those witnesses were lying, the prosecutor was allowed improperly to bolster B.C.'s credibility.

[¶ 20] Because these errors did not occur in a vacuum, we must consider them together with all of the other errors that occurred in the trial of this case, and in doing so, we cannot say that they did not contribute to the verdict. In short, we are not convinced that, absent these errors, the verdict might not have been more favorable to the appellant. More will be said about this in our discussion of trial counsel's ineffectiveness.

***Cross–Examination as to Prior Convictions***

[¶ 21] W.R.E. 609(a)(1) provides as follows:

(a) *General rule.*—For the purpose of attacking the credibility of a witness,

(1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one (1) year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this

evidence outweighs its prejudicial effect to the accused; . . . .

[9, 10] [¶ 22] This rule is patterned after Fed.R.Evid. 609(a)(1), which has been interpreted as follows by a leading commentator:

Where the witness is the accused in a criminal case, the Rule itself sets out a special discretionary standard weighted in favor of exclusion, calling for the court to admit felony convictions only if it determines that probative value outweighs prejudicial effect. For all other witnesses, the Rule incorporates the discretionary standard of Fed.R.Evid. 403, which is weighted in favor of admissibility, allowing evidence to come in unless prejudicial effect substantially outweighs probative worth.

Christopher B. Mueller & Laird C. Kirkpatrick, 3 *Federal Evidence* § 6:42 (3d ed.2007). In Wyoming, we have given effect to that "presumption" in favor of exclusion where the witness is the accused by holding that "a testifying defendant is required to give answers only as to whether he had been previously convicted of a felony, as to what the felony was, and as to when the conviction was had." *Ramirez v. State*, 994 P.2d 970, 973 (Wyo.2000). Given that limitation, it is error for a prosecutor to ask questions of the defendant seeking details about the prior conviction. *Taylor v. State*, 2001 WY 13, ¶ 22, 17 P.3d 715, 723 (Wyo.2001). On the other hand, a defendant who explains his prior conviction during direct examination is subject to cross-examination about the details of the crime. *Ramirez*, 994 P.2d at 973.

[¶ 23] With that law in mind, the appellant now objects to the following colloquy that occurred during his cross-examination by the State prosecutor:

Q. In late October, probably around Halloween, there was another young man that was living in the trailer Jeremy Forquer?

A. That is correct.

Q. And you were sitting in a room at that trailer and according to some witnesses participated in a discussion with Christopher Hicks where you guys decided you were going to kill him?

A. That is incorrect. I offered a polygraph. You still don't care but that's what the testimony is, yes.

Q. The testimony at the trial from Mr. Martinez—

A. That is correct.

Q.—was there was a discussion that took place in that trailer that you participated in where plans—

A. I did not participate in the crime until after the fact.

Q. If I can—

A. Sorry.

Q.—finish my question. The testimony in your trial from Mr. Martinez was there was a discussion that you participated in that night where plans were made to kill Jeremy Forquer. That was the testimony, wasn't it?

A. That was the testimony.

Q. And the testimony at your trial was, in fact, Mr. Martinez and Mr. Hicks killed Mr. Forquer, strangled him to death in that living room right in front of you, that was the testimony?

A. Mr. Martinez strangled and killed Jeremy, yes.

Q. Okay. And you agree that those events happened? He was killed in that trailer?

A. Yes, that's what happened, but not the way he's explaining it.

Q. Okay.

A. The truth never came out in that courtroom.

Q. The body of Jeremy Forquer was loaded into a vehicle?

A. That is correct.

Q. And you traveled with Jacob Martinez and Christopher Hicks and Michael Seiser about 35 miles west of Gillette and at a location selected by you?

A. That is correct.

Q. That body was placed under a tree beside the interstate?

A. That is correct.

Q.—and went back to that trailer and for the next month you didn't tell anybody what happened?

A. He threatened to kill my son. No, I did not tell anyone.

Q. Okay. Late November of 2005—pardon me, mid November 2005 the testimony in the next trial was that you had numerous discussions with your roommates about killing [B.C.] before your trial, before this trial could take place. That was the testimony, wasn't it?

A. That was the testimony of Mr. Martinez per his agreement with you.

Q. All right. Now, the testimony was that you helped them take out some powder of some bullets so that it wasn't so loud. That was the testimony, right?

A. That was the testimony.

Q. The testimony was that they went, they, Mr. Martinez and Mr. Hicks, went up to this trailer that we've all been talking about and Mr. Martinez went in and shot [B.C.] because you told them to. That was the testimony?

A. Testimony only, yes.

Q. Okay. The testimony was that there was a discussion about what to do with the gun and you, in fact, directed them to put the gun in Doug—pardon me, to put the bullet casing in the garage that belonged to [B.C.' s mother's] current boyfriend [D.H.], that was the testimony?

A. That's not the current boyfriend but that was the testimony.

Q. Okay. And it was a previous boyfriend of [B.C.'s mother]?

A. The baby's father.

Q. There we go. The testimony was that you had participated in the discussion that the fact that the gun needed to be submerged and that it actually got thrown into a septic tank by Mr. Hicks and Mr. Martinez where it was later found by law enforcement?

A. That is correct.

[¶ 24] This testimony was followed by the above-discussed "lying" technique cross-examination questions. In addition, the prosecutor based part of his closing argument on the prior convictions:

[The appellant] described for you when I was asking him questions on cross-examination about the allegations in those other

trials that you guys didn't get to hear about, and it's interesting, ladies and gentlemen. It's not just Deputy Mooney, it's not just Bill Heineke, it's the people that he was associated with like Jacob Martinez and Michael [Seiser] and law enforcement officers and it's other witnesses who all had it all wrong.

Notwithstanding the fact a jury sat right where you are and listened to all of that evidence and found Mr. Proffit guilty of being involved in two murders, guilty of conspiring to commit those two murders, and most importantly his participation in the murder of [B.C.] was because he was the witness. The witness, ladies and gentlemen, whose voice you don't get to hear.

██ [¶ 25] The astounding fact that a prosecutor would engage in a cross-examination and would make a closing argument of this nature is exceeded only by the more astounding fact that defense counsel did not object. In effect, the prosecutor "hearsayed in" the testimony from two murder trials, told the jury that the other juries had convicted the appellant of those crimes, and then told the jury that [B.C.] was murdered because he was going to be the witness in the present trial. It is hard to conceive of a more unfairly prejudicial presentation. This scenario is exactly what W.R.E. 609(a)(1), *Ramirez*, and *Taylor* are meant to prevent.

[¶ 26] The only possible justification for these questions and the State's closing argument would be the statement in *Ramirez* that a witness who explains a prior conviction is subject to cross-examination about "those details." *Ramirez*, 994 P.2d at 973. The question then becomes whether the appellant's direct examination opened the door to the prosecutor's questions. This is what the appellant said during his direct examination:

Q. Did you have anything to do with the death of death of [sic] [B.C.]?

A. No, I did not.

Q. Did you know the people that were ultimately convicted of actually killing him?

A. Yes, I do.

Q. Did you have any contact with them—

A. Yes.

Q.—after the death?

A. Yes. As a matter of fact when I found out, I'm like—one of my son's friends called and she told me what had happened and I didn't believe it and I had her to [sic] call to verify it and then she called me back. I'd talked to other people after that. I don't recall actually speaking to them.

I called to make sure. I called Chris Hicks and told him to watch out, watch my son JR and make sure he doesn't get hurt. I did not know that Jacob was going to kill [B.C.]. I did ask—that's the big thing about the caliber of the gun because Chris Hicks allegedly had a .45 and I specifically asked if the, what the caliber was and that's when [B.C.'s mother] told my family what it was.

Q. And what was it?

A. 9–millimeter.

Q. Did you have any other conversations with Mr. Martinez and Mr. Hicks about that?

A. I asked them specifically if they had anything to do with it. If I asked them once, I asked them 100 times, and every time I asked they said, no, because I wouldn't be here being prosecuted if I had known that Mr. Martinez killed my son.

Q. Why is that?

A. Because I would have killed him, as a parent, and that's God as my witness I would.

[¶ 27] We are of the opinion that this exchange, which actually revealed few details about the facts of the murder conspiracy conviction, did not give the State free rein to repeat before this jury the testimony presented during the murder trials. In particular, we note that the appellant made no comment about the Forquer murder. It is true that *Ramirez* recognizes that it may be fair to allow the State to cross-examine a witness on the details of a prior conviction, where the witness first brought up those details. But we went on in *Ramirez*, 994 P.2d at 974, to limit that exception as follows:

"In such cases the defendant may be cross-examined on any facts which are relevant to the direct examination," [*United States v.] Wolf*, 561 F.2d [1376], 1381 [ (10th Cir. 1977) ], provided however, the prosecution

does not "harp on the witness's crime, parade it lovingly before the jury in all its gruesome details, and thereby shift the focus of attention from the events at issue in the present case to the witness's conviction in a previous case." *[United States v.] Robinson,* 8 F.3d [398], 410 [(7th Cir. 1993)].

[¶ 28] This is precisely what happened in this case. The jury's focus was shifted from the facts of the present case to the facts of the two prior murders. The dictates of W.R.E. 609 were not applied in that the district court never made a determination that the probative value of the evidence of the prior convictions outweighed its prejudicial effect. In addition, the prosecutor's questioning went far beyond the details of the conviction involving B.C.'s murder. This was plain error requiring reversal.

### Shifting the Burden of Proof to the Appellant

[¶ 29] The appellant contends that the prosecutor committed misconduct during rebuttal closing argument by shifting the burden of proof to the appellant by way of the following argument:

The defense would like you to make some assumptions in order to justify acquitting Mr. Proffit. [Defense counsel] gets up here and makes a note of this bracelet and he says it was right next to [B.C.] on November 26th when his body was discovered. Well, what's interesting, ladies and gentlemen, is you've got a picture of a bracelet and you've got testimony by the defendant the last time he saw it was in 2003.

He has no idea how [B.C.] got it, and you have no information as to where it was on the nightstand. Would it be helpful to know if it was on the top or if it was the only thing on the nightstand? That it was sitting in some pristine place like it was a valued treasured item or at the bottom of a heap of garbage that you heard a number of people described as the 15–year–old's bedroom? And when officers are executing a search in that room when, they find his dead body, it's one of the many things that's photographed. It would be helpful

to know the circumstances of on the nightstand and what that means.

It would be helpful to know what information, work records would provide about where Mr. Proffit was. He tells you that there's information in those records. He tells you about doctors' visits that are going to back him up and verify his story and you don't see any of that, but what you can see and what you do see, ladies and gentlemen, is that the defendant will tell the same story about how he came to have power and control over [B.C.] and it was [B.C.] who had the courage to step up and explain what happened when the defendant got that power and control.

 [¶ 30] There was no trial objection to this argument, so we now analyze it for plain error. The appellant's present argument is that the prosecutor improperly attempted to shift the burden to the appellant to explain the presence of his bracelet in B.C.'s room, and to produce employment and medical records to substantiate parts of his testimony. The first element of the plain error test is met in that the record is clear as to the prosecutor's argument. As to the second element of plain error, the appellant relies upon *Lane v. State,* 12 P.3d 1057, 1066 (Wyo.2000), for the proposition that the burden of proof rests with the State and never shifts to a defendant. Further, the appellant quotes *People v. Green,* 131 Mich.App. 232, 345 N.W.2d 676, 679 (1983), for the holding that "a prosecutor may not imply in closing argument that defendant must prove something or present a reasonable explanation for damaging evidence because such an argument tends to shift the burden of proof." Finally, the appellant cites *State v. Tosh,* 278 Kan. 83, 91 P.3d 1204, 1212 (2004), where the court disapproved of the prosecutor's question in closing argument, "[I]s there any evidence that it didn't happen?"

 [¶ 31] This Court has previously held, however, that the State is within its proper bounds when a prosecutor comments in argument upon the state of the evidence, including a defendant's failure to introduce material evidence or to call logical witnesses. *Fortner v. State,* 843 P.2d 1139, 1147 (Wyo. 1992). Similarly, a prosecutor may point out

that certain evidence is uncontroverted, or that there is no evidence on a certain point. *Belden v. State,* 2003 WY 89, ¶ 47, 73 P.3d 1041, 1089 (Wyo.2003). While it is not proper for a prosecutor to comment upon a defendant's exercise of his right to silence, it is not improper for a prosecutor to point out the lack of evidence to support a defendant's theory of the case. *Id.*

[¶ 32] We cannot say in this case that the prosecutor's argument was so far outside the realm of appropriate argument as to be misconduct. The appellant testified, and the prosecutor's statements were merely comments upon that testimony. It does not violate an appellant's right to silence, or shift the burden of proof to him, merely to point out the holes or deficiencies contained in his testimony. Consequently, we cannot say that the prosecutor clearly violated an unequivocal rule of law, and we, therefore, cannot say that plain error has been shown.

### Did the appellant's trial attorney provide ineffective assistance of counsel by: (a) failing to make appropriate objections; (b) inviting prejudicial error by inquiring into the investigators' opinions as to the appellant's credibility; or (c) by failing to demand notice of uncharged misconduct evidence, and failing to object to the introduction of uncharged misconduct evidence?

[¶ 33] We have adopted the following standard for determining whether a criminal defendant has received effective assistance of counsel, a right guaranteed by the Sixth Amendment to the United States Constitution and Article 1, Section 10 of the Wyoming Constitution:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both

showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Dickeson v. State,* 843 P.2d 606, 609 (Wyo. 1992) (quoting *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)). The issue of ineffective assistance of counsel involves mixed questions of fact and law, and is reviewed de novo. *Dettloff v. State,* 2007 WY 29, ¶ 17, 152 P.3d 376, 382 (Wyo.2007). We are reluctant to reverse based upon allegations of ineffective assistance of counsel, and have stated that "[i]n the usual case, ineffective assistance of counsel is going to be demonstrable because of a cumulation of errors with a determination that, in the entire context of the trial, the defendant either was, or was not, denied a right to a fair trial." *Dickeson,* 843 P.2d at 612 (citing *Gist v. State,* 737 P.2d 336, 342 (Wyo.1987)).

#### Failing to Make Appropriate Objections

[¶ 34] Although we reviewed the record in this case observing the tenet that trial counsel is to be given the benefit of the doubt when considering whether a "failure" to object is actually a strategic "decision" not to object, we simply cannot accept counsel's performance as adequate under the above-stated test for effective assistance. The district court granted a change of venue for the clear purpose of allowing the appellant's case to be presented to a jury panel that was unaware of, or at least not prejudiced by, his prior convictions in the Forquer and B.C. murder cases. In *voir dire,* opening statement, cross examination, direct examination, and closing argument, however, defense counsel canceled whatever advantage had been gained by the venue change. In particular, defense counsel's failure to object to clearly objectionable testimony and evidence, patently prejudiced the appellant. Examples of those failures include the failure to object to testimony that the appellant had refused to take a polygraph test, the failure to object to testimony presenting the two officers' opinions that the appellant was guilty, the failure to object to testimony that the appellant was a victim of molestation as a child (possibly leading to the assumption that, as a

result, he had become an offender), the failure to object to the prosecutor's "lying" technique during cross-examination, the failure to object to the court's response to the jury question as to use of the prior conviction evidence (as is further discussed hereinbelow), and perhaps the most egregious failure, the failure to object to the prosecutor "hearsaying in" the extremely damaging testimony from the Forquer and B.C. murder cases.

[¶ 35] We have no confidence that the guilty verdicts in this case were based upon the admissible evidence, and we cannot countenance defense counsel's failure to object or decision not to object to the stream of highly prejudicial and objectionable testimony that was admitted. The underlying structure of defense counsel's apparent theory of the case makes no sense. His premise was that, because the earlier juries had not heard the appellant's testimony, the convictions in the earlier cases were unreliable. It supposedly followed that, upon hearing the "truth" from the appellant in the present case, this jury would acquit. What is wrong with that construct is that the appellant could have testified in this case without opening the door to all the damaging testimony from the earlier cases. A bit of it may have come in as impeachment via W.R.E. 609, but the vast majority of it was objectionable. Defense counsel filed, and lost, a pretrial hearsay motion directed at B.C.'s statements. For that, counsel cannot be faulted. But the adverse ruling on that pretrial motion did not preclude him from objecting to the deluge of improper testimony about the murder trials, or about his police interrogation.

[¶ 36] It is true that this Court has almost invariably excused questionable decisions and actions of defense counsel on the ground that such may have been part of a "sound trial strategy." *See, e.g., Magallanes v. State*, 2006 WY 119, ¶ 21, 142 P.3d 1147, 1153 (Wyo.2006) (failure to subject evidence to forensic testing); *Sanchez v. State*, 2002 WY 31, ¶ 16, 41 P.3d 531, 535 (Wyo.2002) (stipulation as to cause of victim's death); *Cureton v. State*, 950 P.2d 544, 547 (Wyo. 1997) (adequacy of pretrial investigation); *Beintema v. State*, 936 P.2d 1221, 1228 (Wyo. 1997) (no limiting instruction requested as to

uncharged misconduct evidence); *McCoy v. State*, 886 P.2d 252, 257 (Wyo.1994) (decision not to call certain witnesses). On the other hand, we have reversed where the "trial strategy" did not rest upon a sound legal basis. *Keats v. State*, 2005 WY 81, ¶¶ 22–23, 115 P.3d 1110, 1119 (Wyo.2005) (trial strategy based upon defendant's diminished capacity, an unavailable defense); *Deshazer v. State*, 2003 WY 98, ¶ 31, 74 P.3d 1240, 1252–53 (Wyo.2003) (counsel admitted lack of basic knowledge essential to formulate trial strategy based upon defendant's lack of competency).

[¶ 37] In the instant case, it is difficult even to identify what may have been defense counsel's trial strategy. Apparently, that strategy largely consisted of the hope that the jury would believe the appellant. Unfortunately, nearly everything defense counsel did, with the exception of winning the motion for a change of venue, appeared to be designed to thwart that end. Garnering trust for one's client rarely begins by allowing the jury to hear the detailed testimony from two murder trials in which that client was convicted. Neither is the client's veracity enhanced by allowing law enforcement officers to testify that they believe he is guilty. This is not trial strategy that any reasonable attorney would follow. As Mark Twain observed in evaluating the writings of James Fenimore Cooper, "crass stupidities [should] not be played upon the reader as 'the craft of the woodsman, the delicate art of the forest[.]' " Mark Twain, *Fenimore Cooper's Literary Offenses*, The Portable Mark Twain 543 (Viking Press, 1968). Trial counsel's performance was ineffective.

### Inquiring Into the Investigators' Opinions as to Appellant's Credibility

[¶ 38] The appellant argues separately on appeal that, not only did defense counsel fail to object when the prosecutor elicited the investigators' opinions that the appellant was guilty, but that he emphasized those opinions by inquiring further about them during cross-examination. For instance, during the cross-examination of Deputy Seeman, the following exchange occurred:

Q. And why did you chose [sic] in this instance to say that you believed that he had done this?

A. At the point we were at in the interview, I felt no need to continue to strengthen his denials. I believed if Mr. Proffit was, who was already denying the allegations that if he was given some type of support in those denials that it would only make the denials stronger. My tactic had switched to attempting to get [B.C.] the help that we both agreed that he needed and that to properly get [B.C.] the help that he needed that we needed to come to the truth and that *I did not believe Mr. Proffit was being honest and truthful.*

I started to actually ask Mr. Proffit if he was ready to tell the truth and Mr. Proffit said, quote, not yet, which *again strengthened our ideas that Mr. Proffit was not being fully honest with us with the reply of not yet when he was asked to tell the truth.*

(Emphasis added.) The deputy's response was not at that point objectionable because it was responsive to the question. Thus, it was invited error. And the error cannot be defended as being part of some logical defense strategy because counsel never utilized it strategically, such as in an attempt to show that the deputy's belief in the appellant's guilt had caused him to fail to follow other leads in the sexual assault investigation.

[¶ 39] While this issue differs somewhat, we conclude that it is simply part of the cumulative ineffectiveness set forth above. Basically, it represents an exacerbation of the prejudice caused by defense counsel's failure to object when the opinions of guilt were first elicited. There are few rules of cross-examination that could be said to be set in stone, but it is hard to conceive of a situation where sound trial strategy would include asking a law enforcement officer why he believed your client was guilty. One reason might be where counsel could then go on to prove that the officer's opinion was based on incorrect information. That did not happen here, and there is no indication that counsel's strategy was to go in that direction.

*Failure to Demand Notice of or Object to Uncharged Misconduct Evidence*

[¶ 40] W.R.E. 404(b) forbids the admission of uncharged misconduct evidence to prove the character of a person to show that he or she acted in conformity with that character. For example, the State may not introduce evidence that an accused earlier committed a burglary, for the purpose of proving that he is, by character, a burglar, and that, therefore, he committed the burglary at issue. Such evidence may, however, be admitted for other purposes, such as to prove motive, intent, or identity.

[¶ 41] We have stated that the admissibility of uncharged misconduct evidence should be tested before trial, preferably via a defendant's demand for notice of the State's intent to introduce such evidence, the State's identification of any such evidence, and a pretrial hearing. *Gleason v. State*, 2002 WY 161, ¶¶ 27–32, 57 P.3d 332, 342–44 (Wyo. 2002); *Howard v. State*, 2002 WY 40, ¶¶ 15–23, 42 P.3d 483, 487–91 (Wyo.2002). In the instant case, the State produced uncharged misconduct evidence at trial, without defense counsel having filed a pretrial demand for notice of such evidence, without defense counsel objecting contemporaneously with the introduction of the evidence, and without the evidence being scrutinized by the district court prior to its admission. The uncharged misconduct evidence included (1) evidence of a sexual assault by the appellant upon B.C. outside Campbell County; (2) evidence of a breach-of-the-peace incident at a convenience store; (3) evidence of the appellant's alleged involvement in a homosexual child pornography ring; and (4) evidence of the Forquer and B.C. murders.

[¶ 42] We must look at defense counsel's failure to object, or decision not to object, not through hindsight, but with the presumption that defense counsel had a strategic purpose for acceding to the introduction of this evidence. *Page v. State*, 2003 WY 23, ¶ 8, 63 P.3d 904, 908 (Wyo.2003). On the other hand, we have recognized that defense counsel's failure to pursue discovery or to demand notice of uncharged misconduct evidence, given "the clarity with which the 'problem'

has been articulated by this Court," may constitute ineffective assistance of counsel. *Williams v. State*, 2004 WY 117, ¶ 12 n. 9, 99 P.3d 432, 440 n. 9 (Wyo.2004). The first question, as with other allegations of ineffective assistance of counsel, is whether, "in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance." *Keats*, 2005 WY 81, ¶ 10, 115 P.3d at 1115. We must answer that question affirmatively in this case, for the reasons already set forth herein. It is our perception that no reasonable attorney in this situation would forfeit the opportunity to prevent the jury from learning about the different instances of uncharged misconduct noted above. While the appellant may have been subject to an attack upon his credibility through introduction of evidence under W.R.E. 609 of the *fact* of the two murder convictions, there was a solid legal basis for defense counsel to attempt to prevent the jury from hearing the *details* of those crimes, or from hearing about the other alleged misconduct.

### Did plain error occur in the district court's response to a jury question?

[¶ 43] During its deliberations, the jury sent the judge a note asking, "do we use the evidence of State Exhibit 2, quote, verdict of conviction, unquote, in determining the verdict[?]"[4] State's Exhibit 2 was the Judgment Upon Jury Verdict holding the appellant guilty of conspiracy to commit the first-degree murder of B.C. After an informal off-the-record discussion with counsel, and with the agreement of counsel, the district court sent the following responsive note to the jury room, without bringing the jury into open court: "State's Exhibit 2 is a piece of evidence which should be given as much weight as you deem appropriate." As will be further discussed below, the appellant contends that this response misstated the law.

[¶ 44] We apply the following standard when reviewing jury instructions:

A trial court is given wide latitude in instructing the jury and, as long as the instructions correctly state the law and the entire charge covers the relevant issue, reversible error will not be found. Instructions must be considered as a whole, and individual instructions, or parts of them, should not be singled out and considered in isolation. Prejudice will be determined to exist only where an appellant demonstrates that the instruction given confused or misled the jury with respect to the proper principles of law.

*Luedtke v. State*, 2005 WY 98, ¶ 28, 117 P.3d 1227, 1232 (Wyo.2005) (citations omitted). Where there has been no trial objection, however, we review for plain error. *Leyva v. State*, 2005 WY 22, ¶ 9, 106 P.3d 873, 876 (Wyo.2005). In particular regard to jury questions evidencing confusion or uncertainty as to applicable law, we have said that it is the trial court's duty to answer such questions. *Heywood v. State*, 2007 WY 149, ¶ 28, 170 P.3d 1227, 1235 (Wyo.2007). *See also United States v. Duran*, 133 F.3d 1324, 1334 (10th Cir.1998) (plain error where trial court fails to clarify law in answer to jury question, and possibility exists that the conviction is based on an incorrect legal basis).

[¶ 45] This issue is linked by the appellant to two issues already discussed herein. The appellant contends that the district court's response to the jury note was legally incorrect because it allowed the jury to use the prior conviction evidence in violation of both W.R.E. 404 and W.R.E. 609. W.R.E. 404, as noted previously herein, limits the use of uncharged misconduct evidence to proof of specific facts such as motive, intent, and identity, which facts should be identified pre-trial by the State, and should be analyzed pre-trial by the court in balancing probative value against unfairly prejudicial effect. In turn, prior conviction evidence is governed by W.R.E. 609(a) when offered to impeach the credibility of a witness, including the defendant. Clearly, the district court's response to the jury note, indicating

---

4. The actual note from the jury is not contained in the record on appeal. The quoted sentence recites the district court's reading of the note in chambers. Where the court used the words "quote" and "unquote," it may be logical to assume that quotation marks appeared in the actual note.

that the jury could give the prior conviction evidence whatever weight it deemed appropriate, was not consonant with these rules. The State takes the position that it was not error for the district court to reply to the jury note as it did because defense counsel had made neither a W.R.E. 404 nor a W.R.E. 609 objection to admission of State's Exhibit 2 when it was offered and admitted.

[¶ 46] This issue properly is addressed under W.R.E. 609, and not under W.R.E. 404, because the appellant testified, and impeaching his credibility was the only justifiable purpose for admission of the exhibit. "Once appellant became a witness, the admissibility of his prior convictions was governed by Rule 609(a), W.R.E., rather than Rule 404(b)." *Robinson v. State*, 716 P.2d 364, 368 (Wyo.1986).[5] Defense counsel's failure to object or decision not to object to admission of the conviction document is understandable, given that the document was admissible under W.R.E. 609. That, however, does not explain why defense counsel did not object to the district court's response to the jury question, which response allowed the jury to consider the conviction document as evidence of the appellant's guilt in the present case, rather than limiting it to impeachment under W.R.E. 609. The response erroneously stated the law as delineated in W.R.E. 609. Consequently, the response can be justified only if defense counsel's failure or decision not to object to the document's admission made it admissible beyond the limited purpose of impeaching credibility.

[¶ 47] We will not further pursue this issue as presented, for two reasons. First, neither the State nor the appellant has cited a single case directed toward the specific issue engendered by this situation: whether defense counsel's failure or decision not to ask for a limiting instruction at the time State's Exhibit 2 was introduced forecloses a subsequent objection to the jury's use of the exhibit as evidence of guilt in the instant case, and concomitantly, whether it was error

for the district court to respond to the jury question as it did. Second, the original failure to object or decision not to object, or to ask for a limiting instruction, along with the later failure to object or decision not to object to the district court's response to the jury note, is so clearly part of the pattern of ineffective assistance of counsel shown throughout these proceedings, that there is no need for this Court on its own to conduct the necessary research on the jury note issue.[6]

### Is the record on appeal incomplete?

[¶ 48] This issue is moot, given our disposition of the other issues.

## CONCLUSION

[¶ 49] Plain error occurred when a State witness testified that the appellant had refused to take a polygraph examination, when the State questioned the appellant and one of appellant's witnesses as to whether other witnesses were lying, and when the State improperly used prior conviction evidence in the cross-examination of the appellant. Plain error did not occur when the State, during rebuttal closing argument, pointed out the lack of evidence supporting the appellant's theory of the case. The appellant received ineffective assistance of counsel when defense counsel failed to make numerous meritorious objections to evidence, when defense counsel invited prejudicial error by inquiring into the investigators' opinions as to the appellant's credibility and guilt, by failing to demand notice of uncharged misconduct evidence and failing to object to the introduction of such evidence, and by failing to obtain a limiting instruction that would have prevented the jury from using prior conviction evidence as substantive evidence of guilt.

[¶ 50] Some trial errors are not of such magnitude as to require reversal. But where trial errors, especially when viewed collectively, "would cause a miscarriage of justice

---

5. That is not to say that prior conviction evidence may not be analyzed under W.R.E. 404(b) when offered to prove some fact governed by that rule. 3 *Federal Evidence* §§ 6:42, 6:57.

6. *See, however, Lyons v. McCotter*, 770 F.2d 529, 533–35 (5th Cir.1985) (failure to ask for limiting instruction, thereby allowing the State full use of the prior conviction in closing, may be ineffective assistance of counsel, even if part of an "inane" trial strategy).

or result in damage to the integrity, reputation, and fairness of the judicial process," or "possess[ ] a clear capacity to bring about an unjust result," reversal is the necessary appellate response. *Heywood*, 2007 WY 149, ¶ 29, 170 P.3d at 1235 (citations omitted).

[¶ 51] We reverse and remand to the district court for a new trial.