# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 7

OCTOBER TERM, A.D. 2019

January 15, 2020

AUBRI VAHAI,

Appellant
(Plaintiff),

v.

S-19-0008

RYAN GERTSCH,

Appellee
(Defendant).

*Appeal from the District Court of Laramie County*
The Honorable Peter G. Arnold, Judge

*Representing Appellant:*
     Richard Gage, Richard Gage, P.C., Cheyenne, Wyoming.

*Representing Appellee:*
     Curtis B. Buchhammer, Buchhammer & Ward, P.C., Cheyenne, Wyoming.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

*KAUTZ, J., delivers the opinion of the Court; GRAY, J., files a specially concurring opinion, in which FOX, J., joins.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]    Ms. Aubri Vahai was rear-ended twice in the span of fifteen months, first by Mr. Ryan Gertsch and then by Mr. James Frew.[1]  Ms. Vahai sued Mr. Gertsch and Mr. Frew, claiming their negligence caused permanent injuries to her cervical and lumbar spine (neck and lower back) which will require future surgery.  Eventually the case went to a jury trial.  Mr. Gertsch and Mr. Frew admitted negligence.  The only issues for the jury were whether negligence caused damage to Ms. Vahai and, if so, the amount.  The jury awarded Ms. Vahai a total of $10,000 in damages and found Mr. Gertsch and Mr. Frew to be 75% and 25% responsible, respectively.  The district court entered judgment accordingly.  Ms. Vahai appeals from the judgment, but her appeal pertains only to Mr. Gertsch because she settled with Mr. Frew after the jury's verdict.

[¶2]    Ms. Vahai contends the district court erred in allowing Mr. Gertsch's Wyoming Rule of Civil Procedure 35 examiner to testify at trial as an expert because Mr. Gertsch did not comply with the disclosure requirements of Wyoming Rule of Civil Procedure 26(a)(2)(B).  We agree, but conclude the admission of the examiner's testimony was harmless.  Ms. Vahai also maintains Mr. Gertsch's closing argument was improper.  She did not object to the closing argument and it was not plainly erroneous.  Finally, she asserts the district court erred in requiring her to disclose her substance abuse treatment records and in allowing their admission at trial because they were privileged, not relevant and unduly prejudicial.  The district court did not err with respect to her treatment records.  We affirm.

## ISSUES

[¶3]    Ms. Vahai raises five issues which we distill to three:

1.  Did the district court err in allowing Mr. Gertsch's Rule 35 examiner to testify as an expert at trial despite Mr. Gertsch's failure to comply with Rule 26(a)(2)(B)?

2.  Did Mr. Gertsch plainly err by personally attacking Ms. Vahai, her counsel, her mother, and one of her experts during closing argument?

3.  Did the district court err in requiring Ms. Vahai to disclose her substance abuse treatment records and in allowing them to be admitted at trial?

---

[1] Mr. Frew died during the pendency of the district court proceedings.  Mr. Frew's wife was named personal representative of his estate and was substituted as a defendant in this case.  For ease of reference, we will refer simply to Mr. Frew.

1

**FACTS**

[¶4]    We provide a brief summary of the facts here.  Other relevant facts will be set forth in the discussion of the issues.

### *The November 2011 Accident*

[¶5]    On November 29, 2011, Ms. Vahai, then 20 years old, was driving a 1992 Ford Escort west on Lincolnway in Cheyenne, Wyoming.  She stopped to make a left-hand turn. While she was waiting for oncoming traffic to clear, Mr. Gertsch, driving a 2005 Dodge Ram pick-up truck with an attached empty trailer, hit the back of her vehicle, pushing it forward about six feet.  Ms. Vahai declined to go to the hospital immediately after the accident but did report to the ER later that evening.  CT scans of her head and neck were normal.  She was diagnosed with whiplash and a myofascial cervical strain, given pain medication and a muscle relaxer, and told to follow up with her private physician within 2-3 days.  She did not follow-up and, in fact, did not seek further treatment until three months later.  In the meantime, she graduated from beauty school and began working as a cosmetologist at Great Clips.

[¶6]    In March 2012, Ms. Vahai saw Dr. Vincent Ross, a physician at Smart Sports, who diagnosed her with cervical, thoracic and lumbar sprains and muscle spasms.   He prescribed 8-16 sessions of physical therapy, but Ms. Vahai completed only four.  During two of those sessions, she reported no pain prior to or after treatment.  On May 2, 2012, she was discharged from physical therapy because she had met her goals; those goals included eliminating her pain.

[¶7]    About a month and a half later, on June 21, 2012, she began treatment with Dr. Michael Thompson, a chiropractor.  He took an X-ray of her cervical spine and diagnosed her with kyphosis (a reversal of the natural C-shaped curve of the cervical spine),[2] a cervical strain/sprain, and dysfunction of the cervical and thoracic spine (neck and mid-back).  Over the course of twenty-four visits, he performed various adjustments to her neck and mid-back, which improved her pain symptoms.  Dr. Thompson planned to take additional X-rays and perform further treatment, but Ms. Vahai did not return to his office after August 31, 2012.

[¶8]    On September 13, 2012, Ms. Vahai saw Dr. Judson Cook, a neurosurgeon, who diagnosed her with a cervical sprain.  Dr. Cook informed her she had reached maximum medical improvement but told her to return to his office if her symptoms worsened or persisted.  Ms. Vahai did not return.

---

[2] Dr. Thompson testified the natural C-shaped curve in the cervical spine is called the lordotic curve. According to him, Ms. Vahai's cervical spine did not curve in the normal direction and, in fact, curved in the opposite direction, which is called kyphosis.

*The March 2013 Accident*

[¶9]    On March 1, 2013, Ms. Vahai was driving a 2011 Suzuki Grand Vitara on Dell Range Boulevard in Cheyenne.  Mr. Frew was driving a 1999 Ford Ranger pick-up truck directly behind her.  Ms. Vahai stopped when traffic in front of her stopped.  Mr. Frew did not stop and rear-ended Ms. Vahai's vehicle.  The collision caused Ms. Vahai's vehicle to hit the pick-up truck stopped in front of her.  Ms. Vahai reported to the ER after the accident. CT scans of her cervical and lumbar spine were normal.  She was diagnosed with whiplash.  By the time of the second accident, Ms. Vahai had left Great Clips and was working 30-35 hours per week as a cosmetologist at Super Cuts.  About two weeks after the second accident, she reduced her hours to 20-25 hours per week.

[¶10]  From March 29 to May 22, 2013, Ms. Vahai received chiropractic treatment from Dr. Ryan Walton.  She did not receive further treatment for her neck or back until October 21, 2014 (seventeen months later), when she saw a physical therapist in Fort Collins, Colorado.

[¶11]  On December 9, 2014, Ms. Vahai saw Dr. Timothy Wirt, a neurosurgeon, who ordered an MRI of her cervical spine.  The radiologist reviewing the MRI reported minimal disk bulges at C-4/C-5 and C-5/C-6.   Dr. Wirt disagreed; he interpreted the MRI as revealing her to have drier than normal discs in her neck, a congenital condition which was not a source of pain and did not require surgery.  Ten days later, Ms. Vahai began seeing neurosurgeons Dr. Fernando Techy and Dr. Kenneth Pettine.  Dr. Techy ordered an MRI of Ms. Vahai's lumbar spine, which revealed a 4.5 mm central disc protrusion at the L-5/S-1 joint.  Over the course of the next year, Dr. Techy or Dr. Pettine ordered that Ms. Vahai receive injections in her neck and lower back.  The injections provided temporary relief.

[¶12]  In July 2016, Ms. Vahai returned to Dr. Ross at Smart Sports, who again referred her to physical therapy.  She was prescribed 8-12 sessions, but completed only four.  In November 2016, Dr. Ross referred Ms. Vahai to Dr. Steven Beer, a neurosurgeon, who examined her on January 9, 2017.  Dr. Beer ordered new MRIs of her cervical and lumbar spine.  He interpreted the MRIs to show kyphosis, disc herniation at C-4 through C-7, and a 4.5 mm disc herniation with an annular tear (a tear in the disc) at L-5/S-1.  He ordered injections to the affected areas.  The injections provided Ms. Vahai pain relief, which confirmed Dr. Beer's diagnosis.

[¶13]  At her last appointment on August 14, 2017, Dr. Beer informed Ms. Vahai of her treatment options—have surgery to fuse the afflicted joints in her cervical and lumbar spine or undergo a procedure called facet rhizotomy to temporarily numb the pain but which is effective only half of the time.  Ms. Vahai indicated she wanted to delay having surgery until after the trial in this matter (which was then scheduled for the following week) but did want to proceed with the facet rhizotomy procedure.  Several weeks later, the trial was

3

continued to the end of February 2018. Ms. Vahai had not had surgery or the facet rhizotomy procedure by the time of trial.

### The Lawsuit and Trial

[¶14] Ms. Vahai filed a complaint against Mr. Gertsch and Mr. Frew claiming she sustained permanent injuries to her neck and back as a result of their negligence. She sought damages for bodily injury, pain and suffering, loss of enjoyment of life,[3] loss of earnings and earning capacity, and future medical care. She did not seek property damages or past medical expenses.

[¶15] At trial, Ms. Vahai presented evidence she did not suffer from neck or back pain prior to the November 2011 accident and her pain was exacerbated after the March 2013 accident. Dr. Thompson testified Ms. Vahai's kyphosis was indicative of her having experienced a severe trauma like whiplash. Dr. Beer testified to his interpretation of Ms. Vahai's injuries and opined she required two surgeries, one to fuse the afflicted joints in her neck (C-4 through C-7) and another to fuse the afflicted joint in her lower back (L-5/S-1). He also testified her injuries were caused by the accidents but could not opine as to which injuries were caused by which accident, other than that he believed the first accident to be more responsible for her injuries than the second. Ms. Vahai testified that due to her young age, she had decided to wait 15 years to have the surgeries, which Dr. Beer opined was appropriate. Ms. Sherry Young, Ms. Vahai's functional capacity expert, testified Ms. Vahai's injuries limited her to full-time sedentary work. Because cosmetology was classified as light-duty work, Ms. Young opined Ms. Vahai could only work part-time as a cosmetologist and it was appropriate for her to have reduced her hours after the second accident.

[¶16] Ms. Liz Kattman, a rehabilitation counselor, testified to the life care plan she created for Ms. Vahai based on the opinions of Dr. Beer and Ms. Young. The plan included the costs of two spinal fusion surgeries, presurgical care including office visits, spinal injections and pain medications, and post-surgical care including X-rays, physical therapy and household assistance. According to Ms. Vahai's expert economist, the cost of that life care plan, in present dollars, was $863,900. The economist also testified Ms. Vahai's loss of earnings as a result of having to work part-time as a cosmetologist until her surgeries (15 years) was $298,000, or $137,200 if she was able to secure full-time sedentary work.

[¶17] While there was no explicit testimony as to the amount of damages for Ms. Vahai's pain and suffering and loss of enjoyment of life, her counsel suggested during closing argument that $300,000 was appropriate given Ms. Vahai's inability to engage in activities

---

[3] In her complaint, she referred to these damages as diminished quality of life damages. However, in the jury instructions and during closing argument, they were referred to as loss of enjoyment of life damages. We will use the latter terminology.

she once enjoyed (sports and dancing) without pain. He also asked the jury to consider that Ms. Vahai will have to live with pain until she has surgery and, even after surgery, will have to live with a fused spine. As for apportionment of damages between the two accidents, counsel argued Mr. Gertsch was 80-85% responsible for Ms. Vahai's injuries and Mr. Frew 15-20% responsible. This argument was based on Dr. Beer's testimony, as well as the opinion of Mr. Frew's Rule 35 examiner, Dr. Greg Reichhardt, who opined Mr. Gertsch was 75% at fault.

[¶18] Mr. Gertsch and Mr. Frew admitted negligence but presented expert testimony that the accidents did not cause Ms. Vahai any permanent injury. Further, their experts indicated that even if the accidents caused the spine issues Ms. Vahai claimed, surgery was not required because those injuries could be treated with stem cell therapy costing approximately $7,000. They also provided expert testimony that Ms. Vahai had no functional limitations preventing her from working full-time as a cosmetologist. Mr. Gertsch and Mr. Frew emphasized Ms. Vahai's gaps in medical treatment, her failure to complete the treatment prescribed, the speculative nature of her damages given that she had not yet had surgery at the time of trial, the fact that she smoked and the negative impact smoking has on healing and the success of fusion surgery, and her failure to mitigate damages, including her failure to undergo stem cell therapy and to pursue a more sedentary full-time job working with troubled youth which could have earned her $3,000 a month. They also introduced evidence attempting to reduce the amount of damages attributed to them, including that Ms. Vahai had been involved in a third accident in a Walgreens parking lot and evidence she abused alcohol and cocaine and suffered from depression, both of which could negatively affect her ability to enjoy life and earn a living.

[¶19] The jury found the first accident (Mr. Gertsch) caused Ms. Vahai $7,500 in damages and the second accident (Mr. Frew) caused $2,500 in damages.

## DISCUSSION

### 1. Did the district court err in allowing Mr. Gertsch's Rule 35 examiner to testify as an expert at trial despite Mr. Gertsch's failure to comply with Rule 26(a)(2)(B)?

[¶20] The district court created a scheduling order which established a deadline for the designation of expert witnesses under Rule 26 and a separate deadline for Rule 35 examinations and reports. In his Rule 26 designation, Mr. Gertsch disclosed one expert and reserved the right to have Ms. Vahai examined by Dr. J. Tashof Bernton under Rule 35. Ms. Vahai agreed to be examined by Dr. Bernton. His examination, which occurred on February 29, 2016, included not only a physical exam but also psychological testing.

[¶21] Dr. Bernton prepared a written report of his examination. He opined Ms. Vahai suffered a myofascial cervical strain from the first accident, which required only

5

emergency room treatment but, in any case, did not require treatment beyond September 2012, and certainly not surgery. His psychological testing revealed Ms. Vahai to have "a heightened report of negative information and elevated functional complaints, as well as depression." As a result, he opined "psychological factors probably play a fairly big role in [her] pain complaints and presentations and functional limitations."

[¶22] Mr. Gertsch disclosed Dr. Bernton's report and designated him as a testifying witness. These actions prompted various motions from Ms. Vahai either to prohibit Dr. Bernton from testifying based on Mr. Gertsch's failure to comply with the disclosure requirements of Rule 26(a)(2)(B), or to require Mr. Gertsch to comply with the rule. She also complained of Dr. Bernton's psychological testing because he was not a psychologist, she was not seeking psychological damages, and she had not been provided notice that she would be subjected to such testing. Mr. Gertsch opposed Ms. Vahai's motions, arguing he was not required to comply with Rule 26(a)(2)(B) because Dr. Bernton was a Rule 35 examiner, not a Rule 26(a)(2) expert. He also maintained the psychological testing was appropriate because Ms. Vahai placed no limitations on the examination and her psychological condition was relevant as it could affect her physical complaints. The district court denied Ms. Vahai's motions "despite some deficiencies in [Mr. Gertsch's] sharing of materials." It did, however, allow Ms. Vahai to designate Dr. Jerry Post, Ph.D., as an expert to rebut Dr. Bernton's testimony.

[¶23] Dr. Bernton's trial testimony was taken via video deposition. During that deposition, Mr. Gertsch's direct examination remained mostly within the scope of Dr. Bernton's report. Mr. Frew, however, cross-examined Dr. Bernton on matters outside the scope of direct examination and his report. Those matters included Dr. Bernton's testimony that (1) stem cell therapy is an effective treatment which is starting to be covered by more insurance companies; (2) Ms. Vahai did not have any work restrictions; (3) many doctors will not perform fusion surgery on patients who smoke because of the greater risk of the fusion failing; and (4) Ms. Vahai had not informed Dr. Bernton of a potential job opportunity working with troubled youth which would not require her to stand and use her arms like she does as a cosmetologist. Ms. Vahai moved to strike these matters, but the district court denied the motion and Dr. Bernton's video deposition was played for the jury at trial.

[¶24] In this appeal, Ms. Vahai contends the district court erred in allowing Dr. Bernton to testify as an expert because Mr. Gertsch failed to comply with Rule 26(a)(2)(B). She also claims Dr. Bernton should not have been allowed to testify regarding the results of the psychological testing because he failed to provide all of the results or the underlying data of that testing as required by Rules 26(a)(2)(B)(ii) and 35(b). She further argues the district court should have stricken Dr. Bernton's cross-examination testimony which went beyond the scope of direct examination and his report. Because we agree with Ms. Vahai that the district court erred in allowing Dr. Bernton to testify at trial despite Mr. Gertsch's non-compliance with Rule 26(a)(2)(B), we need not address her other complaints about his

6

testimony—he should not have testified at all. Although we find error in permitting Dr. Bernton to testify, we conclude all of his testimony, including his psychological opinions and matters raised on cross examination, was harmless.

### *Interplay Between Rule 26(a)(2)(B) and Rule 35*

[¶25]   We normally review a district court's discovery orders and evidentiary rulings for an abuse of discretion. *Rammell v. Mountainaire Animal Clinic, P.C.*, 2019 WY 53, ¶ 29, 442 P.3d 41, 49 (Wyo. 2019) ("District courts have discretion in determining the admissibility of evidence, controlling discovery, and selecting the proper means of sanctioning a discovery violation.") (quotations omitted); *Matter of GAC*, 2017 WY 65, ¶ 32, 396 P.3d 411, 419 (Wyo. 2017) ("A trial court's rulings on the admissibility of evidence are entitled to considerable deference, and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal." (quotations omitted)).   In this case, however, the issue requires an interpretation of our rules of procedure, which is a question of law reviewed *de novo*. *Busch v. Horton Automatics, Inc.*, 2008 WY 140, ¶ 13, 196 P.3d 787, 790 (Wyo. 2008) (citing *Bixler v. Oro Management, LLC*, 2006 WY 140, ¶ 5, 145 P.3d 1260, 1262 (Wyo. 2006)).

[¶26]   We have yet to address whether a Rule 35 examiner who provides expert testimony at trial is required to comply with the disclosure requirements of Rule 26(a)(2)(B). Surprisingly, there is a dearth of case law addressing this particular issue.   Courts which have addressed the relationship between Rule 26 and Rule 35 have done so in the context of whether a Rule 35 examination and report are subject to the deadline applicable to Rule 26(a)(2) expert disclosures.   The results are mixed.   Some courts have concluded that a Rule 35 examination may be subject to the Rule 26(a)(2) expert disclosure deadline if a party intends to call the examiner as a witness at trial. *See, e.g., Diaz v. Con-Way Truckload, Inc.*, 279 F.R.D. 412, 418-19 (S.D. Tex. 2012); *Shumaker v. West*, 196 F.R.D. 454, 456-457 (S.D. W.Va. 2000).   Other courts, however, have concluded Rule 35 examinations and reports are not subject to the Rule 26(a)(2) deadline. *See, e.g., Bush v. Pioneer Human Servs.,* No. C09-0518, RSM, 2010 WL 324432, at *5 (W.D. Wash. 2010) (unpublished); *Waggoner v. Ohio Cent. R.R., Inc.,* 242 F.R.D. 413, 414 (S.D. Ohio 2007). While the former cases provide some support for the proposition that a party seeking to offer a Rule 35 examiner as a testifying expert must comply with Rule 26(a)(2)(B), we need not rely on these cases because the same result ensues from the plain language of our rules.

[¶27]   In interpreting our rules of procedure, "we apply the same rules used in statutory construction." *Busch*, ¶ 13, 196 P.3d at 790 (citing *Cotton v. McCulloh*, 2005 WY 159, ¶ 14, 125 P.3d 252, 257 (Wyo. 2005)).   Our rules of statutory construction are well-established:

We first decide whether the statute is clear or ambiguous . . . . A statute is unambiguous if its wording is such that reasonable persons are able to agree as to its meaning with consistency and predictability. A statute is ambiguous only if it is found to be vague or uncertain and subject to varying interpretations.

If we determine that a statute is clear and unambiguous, we give effect to the plain language of the statute.

We begin by making an inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection. We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe together all parts of the statute in *pari materia*.

If we determine that the statute is ambiguous, we resort to general principles of statutory construction to determine the legislature's intent.

*State v. Bannon Energy Corp.*, 999 P.2d 1306, 1308-09 (Wyo. 2009) (citations and quotations omitted).

[¶28] Rule 35 states in relevant part:[4]

(a) *Order for an Examination.* –

(1) *In General.* – The court where the action is pending may order a party whose mental or physical condition--including blood group--is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner. The court has the same authority to order a party to produce for examination a person who is in its custody or under its legal control.

. . . .

(b) *Examiner's Report.* –

(1) *Request by the Party or Person Examined.* The party who moved for the examination must, on request, deliver to the requester a copy of the examiner's report, together with like reports of all earlier examinations of the same condition. The request may be made by the party against whom the examination order was issued or by the person examined.

(2) *Contents.* The examiner's report must be in writing and must set out in detail the examiner's findings, including diagnoses, conclusions, and the results of any tests . . . .

---

[4] We cite the text of the current rules even though the rules were amended in 2017 and 2018, while the case was pending. The amendments are not relevant to the issues in this case.

[¶29] Rule 35 is not ambiguous.  It allows a court to order a party whose physical or mental condition is in controversy to submit to a physical or mental examination.[5]  It requires the examiner to prepare a report of his findings and disclose it, upon request, to the other party.  "One of the purposes of Rule 35 is to 'level the playing field' between parties in cases in which a party's physical or mental condition is in issue."  *Ragge v. MCA/Universal Studios*, 165 F.R.D. 605, 608 (C.D. Cal. 1995).[6]  *See also*, *CSX Transp., Inc. v. Ryan*, 192 S.W.3d 345, 348 (Ky. 2006) (Kentucky's Rule 35 counterpart "was intended . . . 'to eliminate uncertainty concerning the medical aspects of the cause and permit the preparation of an intelligent and informed defense.'" (quoting *State v. Seier*, 567 S.W.2d 127, 128 (Mo. 1978)).  Rule 35 is silent on the use of the examiner as an expert at trial.  This silence demonstrates testifying examiners are outside the scope of Rule 35.

[¶30] Rule 26(a)(2)(B) is also not ambiguous.  It applies to witnesses "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony."  It requires the disclosure of these witnesses to include a written report containing:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> (v) a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the  case.

Such information is crucial to advancing the purpose of Rule 26(a)(2)(B)—to allow the opposing party "to rebut, to cross-examine, and to offer a competing expert if necessary"

---

[5] A party may be examined under Rule 35 pursuant to the parties' agreement.  Rule 35(b)(6); *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 689 (10th Cir. 2007) ("'[P]hysical and mental examinations [pursuant to Rule 35] are usually arranged by stipulation of the attorneys . . . .'" (quoting 8A Charles Alan Wright, Miller & Marcus, Federal Practice and Procedure § 2234 (2d ed. 1994)).  That is what occurred in this case.  In such circumstances, the requirements of Rule 35(b), including its report requirements, apply.  Rule 35(b)(6).
[6] Because Rule 35 and Rule 26(a)(2)(B) are nearly identical to their federal counterparts, our reliance on federal cases for their persuasive value is appropriate.  *Busch*, ¶ 14, 196 P.3d at 790 (citing *Caldwell v. Cummings*, 2001 WY 106, ¶ 10, 33 P.3d 1138, 1141 (Wyo. 2001)).

9

so as to avoid "ambush at trial." *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009); *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) (quotations omitted).

[¶31] Construing Rules 35 and 26(a)(2)(B) together, we hold Rule 35(b) describes the report which must be provided upon request whenever an expert conducts an examination under Rule 35(a). If that expert is not at any point retained to testify at trial, the examiner need only prepare the report required by Rule 35(b). Rule 26(a)(2)(B), on the other hand, applies to <u>all</u> expert witnesses retained to testify at trial. As a result, if a party seeks to offer his retained Rule 35 examiner as an expert at trial, Rule 26(a)(2)(B) is triggered and the party must comply with that rule's disclosure requirements in addition to the report under Rule 35(b). A single report can satisfy both Rules 35(b) and 26(a)(2)(B) as long as it has the information required by both rules. In this case, Mr. Gertsch retained Dr. Bernton not only to perform a medical examination of Ms. Vahai but also to offer expert testimony at trial. Mr. Gertsch was required to comply with Rule 26(a)(2)(B).

[¶32] Mr. Gertsch makes no argument as to why a Rule 35 examiner could not comply with the requirements of Rule 26(a)(2)(B) and Mr. Frew's Rule 35 examiner, in fact, did so. We see no impediment. A Rule 35 examiner is already required to prepare a written report containing his findings, including his diagnoses, conclusions, and the results of any testing. In most circumstances, that report will largely satisfy the disclosure requirements of Rule 26(a)(2)(B)(i)-(iii). The biggest difference between Rule 35 and Rule 26(a)(2)(B) is the latter's requirements that the expert disclose his qualifications, including the publications he has authored in the last 10 years, the previous cases for which he has provided expert testimony, and his compensation for the work he performed in the case. Rule 26(a)(2)(B)(iv)-(vi). This information is important if the examiner is to offer expert testimony at trial because it may reveal potential impeachment material, including bias. Mr. Gertsch does not contend Dr. Bernton could not supply this information, only that he did not have to.[7]

[¶33] Mr. Gertsch provides two arguments in support of his claim that a party who offers a Rule 35 examiner as an expert at trial need not comply with Rule 26(a)(2)(B). First, he asserts a Rule 35 examiner is similar to a treating physician, and claims that under Rule 26(a)(2)(C) treating physicians, even when they offer an expert opinion at trial, are not required to comply with Rule 26(a)(2)(B). Rather, they need only supply the subject matter

---

[7] In this case, the deadline for expert disclosures preceded the deadline for Rule 35 examinations and reports. Mr. Gertsch does not claim he could not comply with Rule 26(a)(2)(B) because that deadline occurred prior to Dr. Bernton's examination of Ms. Vahai. We imagine, however, that a situation could arise where a plaintiff objects to a Rule 35 examiner testifying as an expert because the Rule 26(a)(2) disclosures with respect to that examiner were made after the expert disclosure deadline. District courts may have to make appropriate adjustments to the deadlines to accommodate the possibility that a Rule 35 examiner may be required to comply with Rule 26(a)(2)(B) if a party intends to offer him as an expert at trial.

10

upon which they will provide expert testimony and "a summary of the facts and opinions to which [they are] expected to testify." Rule 26(a)(2)(C)(ii). Subsection (a)(2)(C), however, explicitly applies to witnesses that are <u>not</u> required to provide a written report under subsection (a)(2)(B). In other words, it applies to those witnesses who are <u>not</u> "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." *See In re Paternity of HLG*, 2016 WY 35, ¶ 22, 368 P.3d 902, 907 (Wyo. 2016) ("It is true that Ms. Parrish was initially employed as a treating medical provider, not as an expert witness. Because Ms. Parrish was not employed specifically as an expert witness, Mother was not required to provide an expert report in discovery."). Mr. Gertsch retained Dr. Bernton to perform a medical examination of Ms. Vahai and to provide expert testimony at trial. Dr. Bernton did not treat her and was not a treating physician. Rule 26(a)(2)(B), not Rule 26(a)(2)(C), applies.

[¶34] Second, Mr. Gertsch contends we need not resort to an interpretation of our rules because the issue is governed by the district court's scheduling order, which did not require the parties' Rule 35 examiners to comply with Rule 26(a)(2)(B). The scheduling order provided deadlines for Rule 35 examinations and reports and required the reports to include, at a minimum, test results, diagnoses and conclusions. In other words, the order reiterated the requirements of Rule 35(b). Like Rule 35 itself, the order did not address what disclosures are required when a party seeks to have his Rule 35 examiner provide expert testimony at trial. The scheduling order did, however, require expert disclosures to comply with Rule 26(a)(2). Because Mr. Gertsch offered Dr. Bernton as an expert at trial, the scheduling order required him to comply with Rule 26(a)(2), including Rule 26(a)(2)(B).[8]

### *Rule 37*

[¶35] Mr. Gertsch admits he did not comply with Rule 26(a)(2)(B) with respect to Dr. Bernton. Given this failure to comply, we turn to Rule 37(c) for the appropriate remedy.

[¶36] Rule 37(c)(1) provides: "[I]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness . . . at a trial, unless the failure was substantially justified or is harmless." "[A] party who fails to comply with its Rule 26 discovery obligations generally is not permitted to use the undisclosed evidence at trial unless the failure was substantially justified or harmless." *Downs v. Homax Oil Sales, Inc.*, 2018 WY 71, ¶ 27, 421 P.3d 518, 525 (Wyo.

---

[8] Mr. Gertsch argues Rule 26(a)(2)(B) allows a court to deviate from its requirements. That is true, and the court did so in this case. *See* Rule 26(a)(2)(B) ("*Unless* otherwise stipulated *or ordered by the court,* . . .") (emphasis added). The scheduling order stated a list of the documents and items supplied to the expert will suffice to satisfy Rule 26(a)(2)(B)(ii) (requiring the expert's report to include the facts or data considered by the witness in forming his opinions). The order did not, however, exempt testifying Rule 35 examiners from Rule 26(a)(2)(B)'s reach.

2018). *See also, HLG*, ¶ 25, 368 P.3d at 908 ("Rule 37(c)(1) provides for automatic exclusion of undisclosed evidence unless there is substantial justification for the failure to disclose, the failure is harmless, or the district court determines another sanction is appropriate."); *Dishman v. First Interstate Bank*, 2015 WY 154, ¶ 29, 362 P.3d 360, 370 (Wyo. 2015) ("Rule 37(c)(1) provides that a party who, without sufficient justification, fails to disclose information as required by Rule 26 is not permitted to use that evidence at trial, unless the failure is harmless."). "The party seeking to avoid exclusion has the burden of establishing its failure to comply with the discovery obligations was harmless." *HLG*, ¶ 25, 368 P.3d at 908 (citing *Black Diamond Energy, Inc. v. Encana Oil & Gas (USA) Inc.*, 2014 WY 64, ¶ 45, 326 P.3d 904, 916 (Wyo. 2014)).

[¶37] Mr. Gertsch made no attempt in the district court to show his failure to comply with Rule 26(a)(2)(B) was substantially justified or harmless; his argument was simply that he did not need to comply. *Downs*, ¶ 29, 421 P.3d at 525-26 ("Given Homax insisted in the proceedings below that it was not required to provide its damages evidence to Mr. Downs because he had not requested it in discovery, it made no effort to establish that its failure was substantially justified or harmless."). On appeal, he continues to maintain he did not need to comply with Rule 26(a)(2)(B) but also contends his failure to comply was harmless because Ms. Vahai was not prejudiced by the admission of Dr. Bernton's testimony. Ms. Vahai, on the other hand, contends she was "severely prejudiced" by the admission of his testimony, as "evidenced by the completely inadequate jury verdict." We agree with Mr. Gertsch that the admission of Dr. Bernton's testimony was harmless.[9]

[¶38] "For error to be regarded as harmful and reversible, there must be a reasonable probability that, in the absence of the error, the verdict might have been different." *Smyth v. Kaufman*, 2003 WY 52, ¶ 29, 67 P.3d 1161, 1170 (Wyo. 2003) (citing *TZ Land & Cattle Co. v. Condict*, 795 P.2d 1204, 1210 (Wyo. 1990)). *See also, Singer v. Lajaunie*, 2014 WY 159, ¶ 41, 339 P.3d 277, 288 (Wyo. 2014) ("[An] error is harmful if there is a reasonable possibility that the verdict might have been more favorable to Mr. Lajaunie if the error had not occurred."). "Where the disputed evidence is a small part of the case, the trial is lengthy and complicated, and there is substantial evidence supporting the result, we are not inclined to find harmful error in the admission of evidence." *Smyth*, ¶ 29, 67 P.3d at 1170 (citing *Herman v. Speed King Mfg. Co.*, 675 P.2d 1271, 1278 (Wyo. 1984)). In undertaking this review, we are mindful that a "jury's determination of the amount of damages is inviolate absent an award which is so excessive or inadequate as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, or other improper cause had

---

[9] Rule 37(c)(1) only prohibits the unidentified witness or undisclosed information from being used at trial. In this case, Mr. Gertsch disclosed Dr. Bernton as a witness and some of his report complied with the requirements of Rule 26(a)(2)(B). Nevertheless, because Mr. Gertsch does not attempt to parse which parts of Dr. Bernton's testimony complied with Rule 26(a)(2)(B) and which did not, we will assume on appeal his entire testimony should have been stricken.

12

invaded the trial." *Carlson v. BMW Indus. Serv., Inc.*, 744 P.2d 1383, 1390 (Wyo. 1987) (quoting *Brittain v. Booth*, Wyo., 601 P.2d 532, 536 (1979)).[10]

[¶39]  Dr. Bernton's testimony was a relatively small part of a trial spanning seven days. There was also substantial evidence, apart from his testimony, supporting the jury's verdict.

[¶40]  The trial in this matter was a "battle of the experts."  Dr. Beer opined Ms. Vahai had permanent injuries to her spine which require two surgeries to repair, and Ms. Young opined Ms. Vahai was limited to full-time sedentary work and could only work part-time as a cosmetologist.  It was these opinions which led to Ms. Kattman's life care plan, which in turn led to the large damage numbers for future medical care and loss of earnings provided by Ms. Vahai's economist.  It is also these opinions which Ms. Vahai relies upon to show the jury's verdict is wholly inadequate.  But these opinions are only half the story.

[¶41]   Dr. Wirt, one of Ms. Vahai's treating neurosurgeons, testified Ms. Vahai suffered from a congenital disc condition in her neck, but it was not a source of her pain and did not require surgery.  He unequivocally testified surgery was not appropriate, stating "if it were your daughter, you wouldn't want me to touch her."

[¶42]  Dr. Reichhardt testified Ms. Vahai possibly had cervical and lumbar sprains but no pinched nerves.  He discounted Dr. Beer's testimony about Ms. Vahai's annular tear, telling the jury "we don't really know what [an annular tear] mean[s]" and most of them are asymptomatic and due to wear and tear, not trauma.  He testified she did not need surgery and the most appropriate treatment for her would be "an independent active exercise program, a core stabilization program, a stretching program for her neck and shoulder area, use of proper posture and body mechanics, . . . anti-inflammator[y] [medication,] . . . [and] a course of counseling with a pain psychologist."  He also opined Ms. Vahai could work full-time as a cosmetologist.

---

[10] We have also considered the following factors in deciding whether a party's violation of its discovery duties was harmless:

> (1) whether allowing the evidence would incurably surprise or prejudice the opposing party;
> (2) whether excluding the evidence would incurably prejudice the party seeking to introduce it;
> (3) whether the party seeking to introduce the testimony failed to comply with the evidentiary rules inadvertently or willfully;
> (4) the impact of allowing the proposed testimony on the orderliness and efficiency of the trial; and
> (5) the impact of excluding the proposed testimony on the completeness of the information before the court or jury.

*Downs*, ¶ 28, 421 P.3d at 525 (quoting *HLG*, ¶¶ 27-28, 368 P.3d at 908-09).  Because we conclude the admission of Dr. Bernton's testimony did not prejudice Ms. Vahai given the substantial other evidence supporting the jury's verdict, application of these factors would not change our conclusion.

[¶43]   Dr. Pettine, another one of Ms. Vahai's treating providers, testified Ms. Vahai did not need surgery.  In fact, he changed his mind during his testimony as to whether surgery was necessary.  He initially testified Ms. Vahai's injuries were permanent and she would need an artificial disc replacement in her cervical spine and either an artificial disc replacement or a fusion in her lumbar spine by the time she was 35 years old.  During that same testimony, however, he reversed course and testified he believed Ms. Vahai to be an "ideal" candidate for stem cell therapy.  He told the jury he had performed the stem cell therapy procedure on over 3,000 patients with "surprisingly efficacious" results:  90% of patients see improvement with 70% of them being 70% better two years after the injection.  He opined that if Ms. Vahai had the procedure and experienced similar results, she would not need surgery; if she had the procedure and it did not help, she could still have surgery.  He testified he could perform the stem cell therapy procedure on Ms. Vahai's neck and back in one procedure and it would cost approximately $7,000.

[¶44]   Dr. John Janzen, Mr. Gertsch's functional capacity expert, testified Ms. Vahai was not limited to performing sedentary work and the accidents did not impair her ability to work as a cosmetologist or cause her any loss in earning capacity.  Even Dr. Ross, one of Ms. Vahai's treating providers, testified he did not place any work restrictions on Ms. Vahai after either accident because he "like[s] to keep [his patients] working if [he] can."  Moreover, the jury heard evidence questioning the validity of Ms. Young's functional capacity testing, which had led to her opinions concerning Ms. Vahai's ability to work.

[¶45]   In addition to the expert testimony, there was other evidence discounting the extent of Ms. Vahai's injuries and her need for surgery.  The evidence indicated the accidents were low-impact.  Mr. Gertsch and Mr. Frew both testified they applied the brakes before hitting Ms. Vahai's vehicle and estimated they were going 10 mph and 10-15 mph at impact, respectively.  The driver of the pick-up truck which Ms. Vahai hit in the second accident testified he was not injured and, although he knew he had been hit, he "wouldn't say it was anything serious."  Photographs of Ms. Vahai's vehicles after each accident and photographs of Mr. Frew's truck after the second accident were shown to the jury.  They revealed Ms. Vahai's vehicle in the first accident to have suffered damage to its trunk but not the driver's compartment and her and Mr. Frew's vehicles in the second accident to have suffered minimal body damage.

[¶46]   Ms. Vahai's own actions discounted the extent of her injuries.  She did not follow-up with her private physician after the first accident, did not complete all of the prescribed physical therapy after both accidents, and went significant periods of time without treatment after both accidents, especially after the second accident.  The evidence also indicated that after the second accident she visited various providers for treatment unrelated to the accidents.  During one of those treatments, an examination of her neck found she had "full passive range of motion without pain" and no spine or muscle tenderness; during the other treatment, she reported no "[m]uscle or joint pain" or "[m]uscle weakness."

14

[¶47]  The evidence also showed Ms. Vahai smoked up to a half a pack of cigarettes a day, which Dr. Pettine testified decreased her chances of having a successful spinal fusion surgery.  Indeed, Dr. Ross told the jury "surgeons won't even operate on someone's back who smokes . . . because it just won't heal as well."  Dr. Reichhardt testified smoking negatively affects the healing process because "nicotine causes a constriction of the blood vessels, which decreases . . . blood supply."  Even Dr. Beer testified that while he does not require his patients to stop smoking in order to have spinal fusion surgery, he does tell them "their chances of having the fusion form solid are less than if they don't smoke."

[¶48]  There was also evidence Ms. Vahai did not mitigate her damages.  She did not have the stem cell therapy procedure, even though she could still have had surgery if the procedure was not effective.  She did not pursue a full-time sedentary job opportunity in which she could have earned more than she did as a hairdresser.

[¶49]  Finally, there was evidence of other causes or contributors to her pain.  Ms. Vahai testified she suffered from depression.  Dr. Wirt testified depression can "have an impact upon one's physical symptoms and complaints."  According to him, while he is not an expert on "having body pain exacerbated by mental issues," "after doing this for 36, going on 37 years," "it's a big issue with people for sure" and something he sees "every day."  Dr. Reichhardt opined his testing of Ms. Vahai revealed there were non-physiological factors, most likely psycho-social stressors, contributing to her pain.  Even Dr. Beer testified depression can be detrimental to a patient's ability to heal after treatment.  The jury also heard evidence that Ms. Vahai abused alcohol and cocaine.  Her parents, Ms. Young, and Dr. Janzen testified such abuse could detrimentally affect her ability to enjoy the pleasures of life and to make a living.

[¶50]  Given the substantial evidence supporting the jury's verdict, there is no reasonable probability that had Dr. Bernton's testimony not been admitted, the outcome would have been different.  The admission of his testimony was harmless.

### 2. Did Mr. Gertsch plainly err by personally attacking Ms. Vahai, her counsel, her mother, and one of her experts during closing argument?

[¶51]  Ms. Vahai declined to go to the hospital immediately after the first accident.  Instead, she called her mother, Jahnice Samson, who picked her up and drove her home.  At the time of the November 2011 accident, Ms. Samson worked as a secretary for Richard Gage, Ms. Vahai's attorney.  In fact, Ms. Samson was at Mr. Gage's office at the time Ms. Vahai called her to pick her up from the accident scene, and Ms. Samson returned to his office after dropping Ms. Vahai off at home.  After Ms. Samson got off work, she went home and Ms. Vahai asked her to take her to the ER, which she did.  During closing argument, Mr. Gertsch's counsel capitalized on these facts, telling the jury:

15

There was an accident with Mr. Gertsch [in] November of 2011, and we've seen the photos, and we know what happened. We also know this. At the scene of the accident, Aubri Vahai . . . said she wasn't injured. She told that to Mr. Gertsch twice. She told it to the police. She didn't request an ambulance. Those are actions. What happened next? Her mother comes to the scene of the accident. Who does her mother work for? Mr. Gage.

It's not perfectly clear from the testimony that was provided, and it would have come from Ms. Vahai, it's not perfectly clear what happened. Did Mom take her home and return to work where she talked to Mr. Gage? I would submit to you that's exactly what happened. And then after she gets off work, that's when she decides it's a good idea to take her daughter to the emergency room. I would suggest to you, ladies and gentlemen, that that is more than just actions. That is an orchestration of events. An orchestration of events set in place to get money.

[¶52] Mr. Gertsch's attorney continued with the "orchestration of events" refrain throughout his closing argument. He described Ms. Vahai's actions after the second accident as follows:

Ms. Vahai goes to the emergency room, but what does she say at the emergency room? And we'll have you have that record. She tells them now she has complaints of not only neck pain, but low back pain. And specifically says, I have not had similar symptoms before. Why would you tell your doctor that if it wasn't true? The doctor is there to help you, and as Dr. Ross testified, . . . he expects his patients to be honest with him. That's what he needs so that he can help them.

Why did she say that at the emergency room after the second accident? I would suggest to you, ladies and gentlemen, that it was part of the orchestration of events. How can I sue Mr. Frew if I don't have new injuries that I can claim?

[¶53] Counsel also reiterated Dr. Pettine's testimony that a stem cell therapy procedure costing about $7,000 could help Ms. Vahai. Yet, Ms. Vahai had not had that procedure. Mr. Gertsch's attorney told the jury:

Why didn't [the procedure] happen? I would suggest to you it didn't happen because as part of the orchestration for large numbers, it wouldn't have worked out very well as we all stand

16

before you today. It simply didn't serve the purpose of this lawsuit.

[¶54] Mr. Gertsch's counsel criticized Ms. Kattman who testified her life care plan for Ms. Vahai included the cost of two spinal surgeries, pre-surgical care, and post-surgical care, including household assistance. He told the jury her damages numbers were:

> Absolutely speculative as to what might happen in the future. Absolutely speculative depending on what numbers you plug in to begin with.
> Most importantly, Ms. Kattman, because it would not give the big numbers that would go into the orchestration that I was talking about, she ignored Dr. Pettine's clear testimony about stem cell therapy.

[¶55] Mr. Gertsch's attorney addressed Ms. Vahai's problem with drugs and alcohol:

> Now, Ms. Vahai also has a problem with drugs and alcohol. And I truly, truly hope . . . that she can defeat those demons. Nobody wants to have to deal with that, but they are nonetheless demons in her life. How does she deal with that? She needs to deal with them head on. She needs to take responsibility for them, and she needs to not deny those demons. And you can't deny those demons if you are too busy orchestrating lawsuits, which is exactly what we're dealing with here. You can't take responsibility and deal with those demons if you want to make somebody else a scapegoat for your problems in life.

[¶56] He also discussed the verdict form which required the jury to apportion any damages between the two accidents. He told the jury he believed Dr. Bernton had "nailed that one" when he testified Ms. Vahai was healed from any injury suffered in the first accident and did not require any medical treatment beyond September 2012. He also told the jury nothing that happened in the second accident could be apportioned to Mr. Gertsch but, in any event, he "would submit . . . that apportionment only becomes important if we start looking at these big [damages] numbers that have been orchestrated."

[¶57] Ms. Vahai argues these inflammatory comments improperly accused her, her mother, her counsel, and her expert of immoral and unethical conduct and suggested they were untrustworthy, unsavory, and gaming the system, thereby inflaming the jury against her. She also claims there was no evidence to support an inference of a conspiracy between her, her attorney, and her mother for a big pay day. In fact, she says there is no way she could have "orchestrated" multiple bulging discs in her spine and the reversal of her neck's

17

lordotic curve. Mr. Gertsch claims his counsel's closing argument was proper. He argues each of the allegedly improper comments was based on the evidence or reasonable inferences to be drawn therefrom and the mere fact his counsel's comments were partisan or harsh does not make them improper.

[¶58] Because Ms. Vahai did not object to any of the allegedly improper comments, our review is for plain error. *Guy-Thomas v. Thomas*, 2015 WY 35, ¶ 10, 344 P.3d 782, 786 (Wyo. 2015) ("Failure to object constitutes waiver of whatever alleged error occurred, unless the error rises to the level of plain error.") (citing W.R.A.P. 9.05). "Plain error exists if the error: 1) clearly appears in the record; 2) transgressed a clear and unequivocal rule of law; and, 3) resulted in material prejudice to a substantial right." *Case v. Outback Pipe Haulers*, 2007 WY 181, ¶ 10, 171 P.3d 514, 516-17 (Wyo. 2007) (citing *Landsiedel v. Buffalo Props., LLC*, 2005 WY 61, ¶ 17, 112 P.3d 610, 615 (Wyo. 2005)). "The burden of establishing plain error is on the party alleging error." *Id*.

[¶59] The alleged errors are clearly reflected in the record. Ms. Vahai, however, has not shown Mr. Gertsch's closing argument to have transgressed a clear and unequivocal rule of law. She relies primarily on criminal cases in which a prosecutor's comments during closing argument were found to have risen to the level of prosecutorial misconduct—*Black v. State*, 2017 WY 135, ¶¶ 33-34, 405 P.3d 1045, 1056-57 (Wyo. 2017) (concluding prosecutor's comments designed to appeal to the jurors' passion or prejudice and attacking defense counsel constituted prosecutorial misconduct); *Carroll v. State*, 2015 WY 87, ¶ 43, 352 P.3d 251, 261 (Wyo. 2015) (stating "personal attacks on defense counsel" are prosecutorial misconduct); and *State v. Smith*, 1999 S.D. 83, ¶¶ 48-50, 599 N.W.2d 344, 354-55 (S.D. 1999) (calling defendant a "monster" and a "pervert" during closing argument amounted to prosecutorial misconduct). These criminal cases are not helpful because we impose special rules on prosecutors during closing argument as a result of their duty to "seek justice, not merely to convict" and to ensure a "defendant has a fair trial." *Jeschke v. State*, 642 P.2d 1298, 1303 (Wyo. 1982); *Valerio v. State*, 527 P.2d 154, 156 (Wyo. 1974). *See also*, *Dixon v. State*, 2019 WY 37, ¶ 37, 438 P.3d 216, 231 (Wyo. 2019) ("Prosecutorial misconduct is a prosecutor's improper or illegal act (or failure to act), *especially involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment*." (quotations omitted) (emphasis added)). Such concerns are not present in a civil case where one of counsel's roles is to zealously advocate for his client's interests. Rule 1.1[2], Wyoming Rules of Professional Conduct.

[¶60] Our own research reveals we afford counsel wide latitude in making closing arguments in civil cases. The only limits we have imposed are that counsel cannot misstate the law or make an argument tending to "influence jurors to depart from their role of impartiality and step into the shoes of a litigant." *See, e.g., Seaton v. State of Wyo. Highway Comm'n, Dist. No. 1*, 784 P.2d 197, 207 (1989) ("[U]nless he misstates the law, counsel may properly comment during his closing argument on any instructions given by the court."); *Logan v. Pac. Intermountain Exp. Co.*, 400 P.2d 488, 494 (Wyo. 1965) (defense

counsel asked the jurors "what would you do" if plaintiff's vehicle fish-tailed across the highway in front of your vehicle; "[t]he mischief of such an argument is that it tends to influence jurors to depart from their role of impartiality and step into the shoes of a litigant" and "[a]s a general rule such a practice is condemned"). Ms. Vahai does not claim Mr. Gertsch's counsel crossed these lines.

[¶61] Perhaps because our civil cases are not helpful to her argument, Ms. Vahai relies on two civil cases from California and Florida. In *Stone v. Foster*, 106 Cal.App.3d 334, 341 (Cal. App. 1980), the plaintiff sued the defendant, a plastic surgeon, for medical malpractice and fraud after a tummy tuck procedure left scars on her abdomen. The jury found in favor of the plaintiff. *Id*. at 340. On appeal, the defendant argued plaintiff's counsel committed misconduct during trial, including during closing argument, by continually seeking to portray the defendant as an evil, dishonest person and leveling personal attacks on him, including calling him the most disgraceful defendant he had ever seen and accusing him of hiding his wealth. *Id*. at 354-55. The California court stated "[p]ersonal attacks on the character or motives of the adverse party, his counsel or his witnesses" as well as "attempts to appeal to the prejudice, passions or sympathy of the jury" are misconduct. *Id*. at 355. It concluded plaintiff's "[c]ounsel committed both forms of misconduct during the trial." *Id*.

[¶62] In *Johnnides v. Amoco Oil Co., Inc.*, 778 So.2d 443, 443 (Fla. Dist. Ct. Appeal 2001), defense counsel's closing argument "contained many serious departures from the standards of conduct [the Florida courts] require of attorneys in [its] jurisdiction, any one of which would alone have required reversal." The court focused, however, on what it deemed to be the "worst"—"the passage in which [counsel], based on nothing but his own cynical imagination, boldly and unashamedly accused opposing counsel of conspiring with the plaintiff's expert to commit a fraud on the jury:

> So what does plaintiff's counsel have to do? *He goes out and finds Dr. Padva and says, Dr. Padva, what we are going to do, we are going to try to get a naive jury. And then what we are going to do is,* I need you to look at all of these tests and somehow *come up with some scientific gobble-dee-cock that confuses the jury."*

*Id*. at 444-45. The court concluded such "baseless attacks of this kind upon the integrity of counsel, or any other player in the case, are both contemptible and condemnable" and required a new trial. *Id*.

[¶63] We are not bound by cases from the appellate courts of California and Florida. However, even if we were to assume, arguendo, that these cases constitute "a clear and unequivocal rule of law," they are distinguishable. The misconduct in *Stone*, unlike the alleged misconduct in this case, was not limited to closing argument. Rather, it permeated

19

the trial, including opening statements and the examination of witnesses. *Stone*, 106 Cal.App.3d. at 353-54. Moreover, the misconduct consisted of counsel calling the defendant evil, dishonest, and the most disgraceful defendant he had ever seen. *Id*. at 354-55. Similarly, the misconduct in *Johnnides* amounted to a factually unsupported claim accusing opposing counsel of engaging in a conspiracy with an expert to commit fraud on the court. *Id.*, 778 So.2d at 444. Taken in context, Mr. Gertsch's counsel's comments did not rise to those levels.

[¶64] The theme of Mr. Gertsch's closing argument was "actions speak[] louder than words." Consistent with that theme, he emphasized Ms. Vahai's actions immediately after the accidents, her mother's actions after the first accident, Ms. Vahai's inaction in not undergoing stem cell therapy, and Ms. Kattman's failure to include stem cell therapy in Ms. Vahai's life care plan despite testifying she was aware of Dr. Pettine's opinion that Ms. Vahai was an ideal candidate for such therapy. All of these actions/inactions were supported by the evidence or reasonable inferences to be drawn therefrom. Counsel then suggested to the jury that these actions and inactions were part of an "orchestration of events" to increase Ms. Vahai's damages. Notably, he did not say she made up her damages or engaged in any type of fraud or conspiracy. Rather, he suggested she had a pecuniary motive. We have found no clear and unequivocal rule of law indicating such argument is improper in a personal injury civil trial.

[¶65] Ms. Vahai also relies on Rules 3.1(a) and 3.4(e) of our rules of professional conduct as support for her claim it was improper for Mr. Gertsch's attorney to suggest a conspiracy between herself and her attorney without any evidence. Counsel did not suggest a conspiracy. Nevertheless, neither rule was violated. Rule 3.1(a) prohibits, among other things, a lawyer from defending a proceeding "unless there is a basis in law and fact for doing so that is not frivolous," and Rule 3.4(e) prohibits a lawyer from alluding at trial to any matter that he "does not reasonably believe is relevant or that will not be supported by admissible evidence" or from stating "a personal opinion as to the justness of a cause, the credibility of a witness, [or] the culpability of a civil litigant." Mr. Gertsch's suggestion in closing argument that Ms. Vahai had a pecuniary motive was not wholly unsupported by the evidence or reasonable inferences therefrom and did not rise to the level of "a personal opinion as to the justness of a cause, the credibility of a witness, [or] the culpability of a civil litigant."

[¶66] Mr. Gertsch's closing argument was not plainly erroneous.

### 3. Did the district court err in requiring Ms. Vahai to disclose her substance abuse treatment records and in allowing them to be admitted at trial?

20

[¶67] Two months prior to trial, Ms. Vahai voluntarily entered a substance abuse treatment center in California for alcohol and drug (cocaine) abuse.  Her attorney notified opposing counsel of the fact that she was receiving treatment but refused to disclose her treatment records to the defendants, claiming they were privileged under Wyo. Stat. Ann. § 33-27-123(a) (LexisNexis 2019).[11]  Ms. Vahai also filed a motion in limine to exclude admission at trial of these records or any evidence concerning her substance abuse and treatment because such evidence was irrelevant to whether the accidents caused her injuries and was otherwise unfairly prejudicial.  Mr. Frew and Mr. Gertsch filed a joint motion to compel disclosure of the treatment records, claiming the records were relevant to Ms. Vahai's claim for damages for loss of enjoyment of life.  The district court granted Mr. Gertsch and Mr. Frew's motion to compel and denied Ms. Vahai's motion in limine.

[¶68]  Ms. Vahai argues the district court erred in requiring her to produce her substance abuse treatment records and in allowing them to be admitted as evidence at trial.  She contends those records were privileged under § 33-27-123, and she did not waive that privilege as she did not seek damages for emotional distress or for any diagnosable mental health disease.  Rather, she sought damages only for pain and suffering which, she claims, did not put her mental state at issue.

[¶69]  We normally review a district court's rulings on admissibility of evidence for an abuse of discretion.  *GAC*, ¶ 32, 396 P.3d at 419.  "To the extent [such rulings] require[] interpretation of statutes or court rules, our review is *de novo*."  *Id*.

[¶70]  Section 33-27-123 provides in pertinent part:

> (a) In judicial proceedings, whether civil, criminal, or juvenile, . . . a patient or client . . . may refuse to disclose or prevent the disclosure of confidential information, including information . . . communicated to a person licensed or otherwise authorized to practice under this act, or to persons reasonably believed by the patient or client to be so licensed, and their agents, for the purpose of diagnosis, evaluation or treatment of any mental or emotional condition or disorder.  The psychologist shall not disclose any information communicated as described above in the absence of an express waiver of the privilege except in the following circumstance[s]. ****
>
> (vi) Where the patient or client, by alleging mental or emotional damages in litigation, puts his mental state in issue

---

[11] Ms. Vahai's privilege log cited Wyo. Stat. Ann. § 33-28-113, but she presumably meant to cite Wyo. Stat. Ann. § 33-27-123.

21

and production of those materials by the patient or client is required by law[.]

[¶71]   Although Ms. Vahai does not rely on it, § 33-38-113 establishes a similar "privilege for information communicated by a patient or client to professional counselors, marriage and family therapists, social workers, and chemical dependency specialists for the purpose of diagnosis, evaluation or treatment of any mental or emotional condition or disorder." *GAC*, ¶ 37, 396 P.3d at 420 (quotations omitted).  It states in relevant part:

> (a) In judicial proceedings, whether civil, criminal, or juvenile, . . . a patient or     client . . . may refuse to disclose and may prevent the disclosure of confidential   information, including information . . . communicated to a person licensed or      otherwise authorized to practice under this act, and their agents, for the          purpose  of  diagnosis,  evaluation  or treatment of any mental or emotional       condition         or disorder.  A person licensed or otherwise authorized to practice under this   act   shall   not   disclose   any   information communicated as described above          in the absence of an express  waiver  of  the  privilege  except  in  the  following circumstance[]:
>     . . . .
> (vi) Where  the  patient  or  client  alleges  mental  or emotional damages in civil litigation . . . .

The purpose of both privileges is "to encourage full and frank disclosure between an individual and a [specified provider] for the purpose of effective diagnosis, evaluation, and treatment."  *Cooper v. State*, 2002 WY 78, ¶ 8, 46 P.3d 884, 888 (Wyo. 2002) (citing Developments in the Law—Privileged Communications, 98 Harv. L. Rev. 1450, 1472-73 (1985)).[12]

---

[12] Mr. Gertsch argues § 33-27-123 does not apply in this case because, on its face, it applies only to psychologists licensed in Wyoming and there is no evidence Ms. Vahai saw a Wyoming-licensed psychologist while being treated in California.  This argument ignores the similar privilege in § 33-38-113, which applies to confidential communications made to professional counselors, marriage and family therapists, social workers, and chemical dependency specialists.  Mr. Gertsch does not claim Ms. Vahai did not see one of these professionals while in treatment.  His argument also ignores that California has a similar privilege.  *See* Cal. Evid. Code § 1014.  That provision provides a patient "a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist . . . ."  Mr. Gertsch fails to show how California's privilege law differs from Wyoming's.  As a result, we decline to find a conflict.  In such circumstances, we need not engage in a conflict of law analysis to choose which law to apply; we apply the law of the forum (Wyoming).  *See Act I, LLC v. Davis*, 2002 WY 183, ¶ 11, 60 P.3d 145, 149 (Wyo. 2002) (citing 15A C.J.S. Conflict of Laws, §§ 27, 41 (2002); 16 Am.Jur.2d Conflict of Laws § 85 (1998)).

22

[¶72] On their face, §§ 33-27-123 and 33-38-113 protect "confidential information" "communicated" by a patient to her treatment provider "for the purpose of diagnosis, evaluation or treatment of any mental or emotional condition or disorder" unless, relevant here, the patient alleges "mental or emotional damages" in litigation. Mr. Gertsch does not argue Ms. Vahai's substance abuse treatment records do not constitute confidential information communicated to her treatment providers for the purpose of treatment. Rather, he claims they were not privileged under the exceptions contained in §§ 33-27-123(vi) and 33-38-113(vi) because Ms. Vahai has alleged mental and emotional damages in this litigation by seeking damages for loss of enjoyment of life.[13] We agree.

[¶73] Loss of enjoyment of life damages "compensate[] an injured person for impairment of the capacity to enjoy the normal pleasures of living." *Lang v. Nissan N. Am., Inc.*, 170 S.W.3d 564, 571-72 (Tenn. 2005). *See also, McGee v. A C and S, Inc.*, 933 So.2d 770, 773 (La. 2006) ("Loss of enjoyment of life . . . refers to detrimental alterations of the person's life or lifestyle or the person's inability to participate in the activities or pleasures of life that were formerly enjoyed."). We have held that loss of enjoyment of life damages "are intended, in some measure, to compensate injured parties for their pain, suffering, and *mental anguish*." *Meerscheidt v. State*, 931 P.2d 220, 224 (Wyo. 1997) (emphasis added) (citing *Mariner v. Marsden*, 610 P.2d 6, 11-13 (Wyo. 1980)). By seeking loss of enjoyment of life damages in this case, Ms. Vahai alleged "mental or emotional damages." Sections 33-27-123(a)(vi) or 33-38-113(a)(vi).

[¶74] Ms. Vahai argues application of the exceptions contained in §§ 33-27-123(a)(vi) and 33-38-113(a)(vi) to this case effectively eviscerates the privilege given the pervasiveness of claims for such damages in tort actions. This argument essentially asks us to modify the statute by limiting the exceptions. We decline that invitation. "It is up to the legislature, not this Court, to . . . decide when a claim of privilege should and should not be allowed." *GAC*, ¶ 48, 396 P.3d at 423 (citing *Cheyenne Newspapers, Inc. v. Bd. of Trustees of Laramie Cnty. Sch. Dist. #1*, 2016 WY 113, ¶ 24, 384 P.3d 679, 685-86 (Wyo. 2016)). Moreover, the purpose behind the exceptions contained in §§ 33-27-123(a)(vi) and 33-38-113(a)(vi) is to prevent a patient from using the privilege not only as a shield but as a sword. *McCormick on Evidence*, § 103. Allowing Ms. Vahai to use the statutory privilege to protect her substance abuse treatment records from disclosure (shield), while at the same time allowing her to bring an action for damages implicating her mental and emotional condition (sword), would effectively gut the exceptions.

---

[13] Mr. Gertsch also argues Ms. Vahai opened the door to evidence concerning her substance abuse by raising the issue in voir dire and opening statement, by eliciting such evidence during her testimony and the direct examination of Dr. Thompson and Ms. Kattman, and by failing to object when he or Mr. Frew raised these issues when cross-examining her, Dr. Ross, Dr. Beer, Ms. Young, and Ms. Kattman. Because we conclude Ms. Vahai's treatment records were not privileged under Wyoming law and were relevant and not unduly prejudicial, we need not address this alternative argument.

[¶75] In the alternative, Ms. Vahai argues her treatment records were not relevant to whether Mr. Gertsch's and Mr. Frew's actions caused her damages, *see* W.R.E. 402, and, in any event, any relevancy was substantially outweighed by the danger of unfair prejudice under W.R.E. 403. W.R.E. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 402 states all relevant evidence is admissible but irrelevant evidence is not. Rule 403 is an exception to when relevant evidence is admissible. It allows relevant evidence to "be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403.

[¶76] Ms. Vahai's substance abuse treatment records were relevant to defending against her damage claims for loss of enjoyment of life and loss of earnings. Mr. Gertsch and Mr. Frew admitted negligence but tried to reduce the amount of damages attributable to their negligence. Other potential causes or contributors to Ms. Vahai's damages were relevant to that pursuit, including Ms. Vahai's substance abuse, which could certainly impair her ability to enjoy the pleasures of life and affect her ability to earn a living. Indeed, her parents admitted alcohol and cocaine abuse could have a significant negative impact on a person's quality of life, financial well-being and relationships with other people. Dr. Janzen testified Ms. Vahai's substance abuse posed a risk to her future employability.

[¶77] The district court did not explicitly perform the balancing test required by Rule 403. However, by denying Ms. Vahai's motion in limine to exclude evidence of her substance abuse and treatment, which included her argument that such evidence was unfairly prejudicial and would cause confusion of the issues, the court implicitly concluded the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice and confusion of the issues. We see no abuse of discretion.

[¶78] Rule 403 is "'weighted in favor of admissibility, allowing evidence to come in unless prejudicial effect substantially outweighs probative worth.'" *Glenn v. Union Pac. R.R. Co.*, 2011 WY 126, ¶ 20, 262 P.3d 177, 185 (Wyo. 2011) (quoting *Proffit v. State*, 2008 WY 114, ¶ 22, 193 P.3d 228, 237 (Wyo. 2008)). It is "'to be used sparingly, because it excludes evidence which is concededly relevant and probative.'" *Id*. (quoting *Mintun v. State*, 966 P.2d 954, 959 (Wyo. 1998). "'Rule 403 does not allow the exclusion of evidence simply because it is prejudicial. All of the evidence against appellant is 'prejudicial.' The evidence must be *unfairly* prejudicial before its prejudicial effect is weighed against its probative value." *Id*., ¶ 21, 262 P.3d at 185 (quoting *Robinson v. State*, 716 P.2d 364, 367 n.2 (Wyo. 1986)). "Unfairly prejudicial evidence is evidence which will likely 'stimulate an excessive emotion or . . . awaken a fixed prejudice . . . and thus dominate the mind of the [jury] and prevent a rational determination of the truth.'" *Id*. (quoting *Furman v. Rural Elec. Co.*, 869 P.2d 136, 146 (Wyo. 1994)). Evidence of Ms. Vahai's substance abuse and treatment was prejudicial, but not unfairly so. Moreover, any prejudicial effect of the

evidence did not "substantially outweigh" its probative value with respect to Ms. Vahai's damages.

## CONCLUSION

[¶79]   The district court erred in allowing Mr. Gertsch's Rule 35 examiner to testify as an expert at trial without complying with the disclosure requirements of Rule 26(a)(2)(B), but the error was harmless given the substantial evidence supporting the jury's verdict.  Mr. Gertsch's closing argument was not plainly erroneous, and the district court did not err in requiring Ms. Vahai to disclose her substance abuse treatment records and admitting them at trial.

[¶80]   We affirm.

**GRAY, Justice,** specially concurring, in which **FOX, Justice,** joins.

[¶81]  I agree with the majority's result and most of its analysis, but I write separately because I do not agree that seeking damages for loss of enjoyment of life necessarily puts the plaintiff's mental health at issue, thus waiving the mental health treatment privilege codified in Wyo. Stat. Ann. §§ 33-27-123, 33-38-113 (LexisNexis 2019).  Rather, I would join the jurisdictions that hold that a plaintiff must do more than assert garden variety claims of loss of enjoyment of life or emotional distress to waive the mental health privilege conferred by statute.[14]

---

[14] *See, e.g.*, *In re Sims*, 534 F.3d 117, 141–42 (2d Cir. 2008) ("Finally, we reject respondents' contentions that 'anybody' who requests damages for 'pain and suffering has waived the psychiatric privilege' 'because the psychiatric records might conceivably disprove the experiencing of the pain and suffering,' that any claim of 'even . . . 'garden variety' injury waives the psychotherapist-patient privilege,' and that a plaintiff's mental health is placed in issue whenever the plaintiff's claim for 'unspecified damages' may 'include[] some sort of mental injury.'  In reality respondents simply seek to have the privilege breached whenever there is a possibility that the psychiatric records may be useful in testing the plaintiff's credibility or may have some other probative value.  To accept these contentions would inject the balancing component that *Jaffee* [*v. Redmond*, 518 U.S. 1, 116 S. Ct. 1923, 135 L. Ed. 2d 337 (1996)] foreclosed, and would disregard the principle that '[p]arties . . . do not forfeit [a privilege] merely by taking a position that the evidence might contradict[.]'  If this principle were not the rule, then in virtually every case a forfeiture might be found, as in virtually every case the party opposing the privilege could argue that the psychological record might reveal evidence that the party asserting the privilege is testifying falsely." (internal citations omitted)); *Smith v. Equinox Holdings, Inc.*, No. 14-CV-00846-LB, 2015 WL 628361, at *3 (N.D. Cal. Feb. 12, 2015) ("[a]llowing inquiry into [plaintiff's] medical records for the apparently ordinary emotional distress that he claims would defeat the purpose of the [psychotherapist-patient] privilege" (citation and internal quotation marks omitted)); *Gering v. Deutsch*, No. 7:13CV5009, 2014 WL 7331824, at *7 (D. Neb. Dec. 19, 2014) ("garden-variety mental anguish claims . . . do not waive [the] physician-patient privilege"); *Lahr v. Fulbright & Jaworski, L.L.P.*, 164 F.R.D. 204, 210–11 (N.D. Tex. 1996) (holding that the plaintiff affirmatively placed her mental condition in controversy by claiming intentional infliction of emotional distress, but not by claiming compensatory damages for "emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life" associated with working in a hostile environment); *O'Quinn v. New York Univ. Med. Ctr.*, 163 F.R.D. 226, 228 (S.D.N.Y. 1995) (holding that because the plaintiff was not pursuing claims for *ongoing severe* emotional harm and had not alleged an independent tort claim for emotional distress, she did not place her mental condition in controversy); *Turner v. Imperial Stores*, 161 F.R.D. 89, 97 (S.D. Cal. 1995) (noting that in order to establish that the other party's mental condition is "in controversy" under Rule 35, "the moving party must show more than that the party in question has claimed emotional distress"); *Bridges v. Eastman Kodak Co.*, 850 F. Supp. 216, 222 (S.D.N.Y. 1994) (holding that the plaintiffs, who alleged sexual harassment in violation of Title VII and state law, did not place their mental condition in controversy by alleging emotional suffering and mental anguish as a result of abusive working conditions, noting that the plaintiffs had not alleged a separate tort claim for emotional distress, or *ongoing severe* mental injury); *Curtis v. Express, Inc.*, 868 F. Supp. 467, 469 (N.D.N.Y. 1994) (holding that the plaintiff in a race discrimination case did not place her mental condition in controversy where she did not allege a separate tort claim for emotional distress, and only claimed damages for *past* mental suffering); *Sabree v. United Bhd. of Carpenters & Joiners of Am., Local No. 33*, 126 F.R.D. 422, 426 (D. Mass. 1989) (holding that plaintiff had not placed his mental condition at issue when he made a "garden-variety claim of emotional distress, not a claim of psychic injury or psychiatric disorder" (citation omitted)); *Robinson v. Jacksonville Shipyards, Inc.*, 118 F.R.D. 525, 531 (M.D. Fla. 1988) (holding that the plaintiff in a sexual harassment case did not place her mental condition in controversy by alleging that her

[¶82] In questions of privilege the conflicting interests are: (1) the individual's interest in privacy and nondisclosure; and (2) society's interest in disclosure necessary to attain full justice in its courts. *See Jaffee v. Redmond*, 518 U.S. 1, 9–10, 116 S. Ct. 1923, 1928, 135 L. Ed. 2d 337 (1996) ("Guided by these principles, the question we address today is whether a privilege protecting confidential communications between a psychotherapist and her patient 'promotes sufficiently important interests to outweigh the need for probative evidence . . . .' Both 'reason and experience' persuade us that it does." (internal citations omitted)).[15] These competing principles require the reconciliation of privilege and

psychological well-being was seriously affected by defendants' workplace sexual harassment); *Weil v. Dillon Companies, Inc.*, 109 P.3d 127, 129–30, 131 (Colo. 2005) ("A plaintiff does not impliedly waive this privilege merely by seeking damages under a generic claim of mental suffering which is incidental to the physical injuries underlying the suit. Rather, waiver of the physician-patient privilege occurs when the privilege holder has injected his physical or mental condition into the case as the basis of a claim or an affirmative defense. . . . [B]are allegations of mental anguish, emotional distress, pain and suffering, and loss of enjoyment of life . . . do not rise to the level of injecting . . . prior mental and physical conditions into the case to the extent that . . . the physician-patient privilege [is waived]." (citations and internal quotation marks omitted)); *Ellis v. Gurich*, 73 P.3d 860, 861 (Okla. 2003) (the filing of an action alleging damages for grief and loss of companionship does not waive physician-patient privilege and discovery of "psychiatrists, psychologists, therapists and/or counselors" and "mental health care history" in general is prohibited (citation and internal quotation marks omitted)); *Reda v. Advocate Health Care*, 765 N.E.2d 1002, 1008–10 (Ill. 2002) (plaintiff does not place mental health at issue by making claims of damages due to a diminished physical capacity to perform daily activities, loss of society, companionship, and affection in his complaint or by discussing "headaches, loss of memory, decline in comprehension, difficulties in performing daily activities, and changes in personality"); *Johnson v. Trujillo*, 977 P.2d 152, 157 (Colo. 1999) ("generic claims for damages for mental suffering incident to" physical injuries do not waive mental health treatment privilege); *In re Morgan*, 507 S.W.3d 400, 404 (Tex. App. 2016) (medical records discoverable only when patient's "condition [is] so central as to require the jury, as part of its determination of the claim or defense, to make a factual determination concerning the condition itself" (citation and internal quotation marks omitted)); *In re Doe*, 22 S.W.3d 601, 610 (Tex. App. 2000) (holding litigation exception to physician-patient privilege inapplicable because plaintiff's claim of negligence, including request for mental-anguish damages, did not allege "severe emotional condition" to place mental condition at issue); *see also Gormley v. Edgar*, 995 A.2d 1197, 1204–06 (Pa. Super. Ct. 2010) (mental health was directly at issue where plaintiff alleged she suffered from anxiety as a result of the accident and where "a party seeks recovery for aggravation of a pre-existing . . . condition"); *Doyle v. Superior Court*, 58 Cal. Rptr. 2d 476, 478 (Ct. App. 1996) (allegations of *past* mental distress are insufficient to place the plaintiff's mental condition in controversy).

[15] In *Jaffee v. Redmond*, the Supreme Court first recognized a psychotherapist-patient privilege in federal law. *Jaffee* was a civil rights suit claiming the excessive use of force by a police officer. There, the plaintiff sought to compel disclosure of the defendant police officer's confidential communications with his therapist, a licensed clinical social worker. The Supreme Court held that "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501." *Jaffee*, 518 U.S. at 15, 116 S. Ct. at 1931. The Court squarely rejected the position that a court should balance the need for relevant information in the particular case against the invasion of a patient's privacy. *Id.* at 17, 116 S. Ct. at 1932 ("Making the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege."). In *Jaffee*, however, there was no waiver issue. The Court did observe that a "patient may of

27

disclosure. The most prominent exception to the privilege is the one at issue here—the "patient-litigant" exception. The patient-litigant exception allows disclosure of otherwise privileged communications in cases where the patient's mental health is at issue. Wyo. Stat. Ann. §§ 33-27-123(a)(vi), 33-38-113(a)(vi). Generally, in order to obtain psychiatric records, the party requesting the records must show the opposing party has placed his or her mental condition "in controversy." *Hoffman v. Brookfield Republic, Inc.*, 87 P.3d 858, 862–64 (Colo. 2004) (analyzing whether the plaintiff placed mental health "in controversy").[16]

[¶83] *Koch* summarizes the various paths courts have taken:

> The narrow approach . . . means "patients only waive the privilege by affirmatively placing the substance of the advice or communication directly in issue" . . . . The "broad" approach . . . [is] taken in S*choffstall* [*v. Henderson*, 223 F.3d 818, 823 (8th Cir. 2000) (which held that when a plaintiff makes a claim for emotional distress, he or she waives the psychotherapist-patient privilege by placing his or her mental condition at issue)]. . . . [T]he "middle ground" [approach states that]: "[W]here a plaintiff merely alleges 'garden variety' emotional distress and neither alleges a separate tort for the distress, any specific psychiatric injury or disorder, or unusually severe distress, that plaintiff has not placed his/her mental condition at issue to justify a waiver of the psychotherapist-patient privilege."

*Koch v. Cox*, 489 F.3d 384, 390 (D.C. Cir. 2007) (internal citations omitted); *see also Sessa v. Reinauer Transp. Companies, LLC*, No. 8:04-CV-1559-T-24MSS, 2005 WL 8160229, at *2 (M.D. Fla. June 15, 2005) (discussing the broad approach and the narrow approach).

[¶84] Many jurisdictions have adopted the middle approach, which directs courts to inquire into the nature of the claims for mental or emotional distress. *Kubik v. Cent. Michigan Univ. Bd. of Trs.*, No. 15-CV-12055, 2016 WL 9631633, at *3–8 (E.D. Mich.

---

course waive the protection" of the privilege, *id.* at 15, 116 S. Ct. at 1931 n.14, but the Court did not speak further on the subject of waiver.

[16] The standard used in determining waiver of privilege mirrors that used in determining the propriety of a Rule 35 mental health examination. *See, e.g.*, *Stevenson v. Stanley Bostitch, Inc.*, 201 F.R.D. 551, 557 (N.D. Ga. 2001) ("determining whether the plaintiff has placed her mental condition at issue so as to waive the privilege is analogous to, and should be generally consistent with, the analysis conducted when a Rule 35(a) examination is requested"); *Jackson v. Chubb Corp.*, 193 F.R.D. 216, 226 (D.N.J. 2000) (considering a Rule 35 analysis analogous to a psychotherapist/patient waiver analysis); *St. John v. Napolitano*, 274 F.R.D. 12, 19–20 (D.D.C. 2011) (finding the factors for a Rule 35 analysis "equally applicable for analyzing whether or not an emotional distress claim is 'garden variety' in the waiver context").

Mar. 17, 2016), *objections overruled*, No. 15-CV-12055, 2016 WL 4425174 (E.D. Mich. Aug. 22, 2016); *Salser v. Dyncorp Int'l, Inc.*, No. 12-10960, 2014 WL 7139886, at *2 (E.D. Mich. Dec. 12, 2014); *see also Pliego v. Hayes*, 86 F. Supp. 3d 678, 691 (W.D. Ky. 2015); *Burke v. Lawrence*, No. 1:11-CV-1044, 2013 WL 2422883, at *2 (W.D. Mich. June 3, 2013); *Gaines-Hanna v. Farmington Pub. Sch.*, No. 04-CV-74910-DT, 2006 WL 932074, at *8 (E.D. Mich. Apr. 7, 2006). These courts have held a party does not place his or her mental condition in controversy merely by requesting damages for "garden variety" emotional distress. *Gaines-Hanna*, 2006 WL 932074, at *8 (citing *Stevenson*, 201 F.R.D. at 553).

[¶85] In assessing whether "garden variety" or more extensive emotional damages have been alleged, courts look beyond the label given the request for damages to the substance of the claim. The Colorado Supreme Court has examined this issue on multiple occasions.[17] In *Hoffman*, the Colorado Supreme Court looked to the substance of the plaintiff's claim to determine whether she "injected her mental condition into the case." *Hoffman*, 87 P.3d at 862. The court determined the plaintiff had alleged only a garden variety mental suffering claim and not injected her mental condition into the case because she had not "sought . . . significant counseling for distress related to the accident, ha[d] not sought compensation for psychiatric expenses, and [did] not plan to call any expert witnesses to testify regarding the nature and extent of her emotional distress." *Id.* at 864. A year later in *Weil*, the Colorado Supreme Court analyzed whether a plaintiff waived the privilege by alleging a loss of enjoyment of life. Again, the court determined that garden variety claims for mental suffering do not waive the privilege. *Weil*, 109 P.3d at 131 ("Weil does not seek compensation for counseling or treatment of a psychological nature. Nor is there any evidence that he intends to call an expert witness to testify to his mental suffering or loss of enjoyment of life. Weil's responses to the interrogatories, that he developed a fear of falling and anxiety over a misdiagnosis as a result of the incident, only express the

---

[17] The Colorado statute, like the Wyoming statutes, does not allow for disclosure of privileged information without waiver. *Compare* Wyo. Stat. Ann. §§ 33-27-123(a)(vi), 33-38-113(a)(vi), *with* Colo. Rev. Stat. Ann. § 13-90-107(1)(g). The Colorado Supreme Court held that:

> [O]nce the physician-patient and psychologist-client privileges come into being . . . that privileged information cannot be disclosed "without the consent" of the patient and client. "Consent" . . . requires proof of waiver. . . . [I]t would be inappropriate for us to read into the statutory scheme an implied waiver based on nothing more than the privilege holder's act of filing a pleading in a case in which his physical or mental condition may be an issue. In our view, the appropriate inquiry under such circumstances should be whether the privilege holder has injected his physical or mental condition into the case as the basis of a claim or an affirmative defense.

*Clark v. Dist. Court, Second Jud. Dist., City & Cty. of Denver*, 668 P.2d 3, 10 (Colo. 1983). Here, Ms. Vahai specifically stated, and the jury was instructed, that she was not seeking emotional damages. *See infra* note 18 and accompanying text. Thus, the only issue is whether she placed her emotional or mental state at issue. The Colorado inquiry into whether a party injected his or her mental or emotional state into a case, thus waiving the privilege, is substantially similar to our statute requiring that the party place their mental state "at issue."

29

nature of his injury. . . . Weil's 'bare allegations of mental anguish, emotional distress, pain and suffering, and loss of enjoyment of life' asserted in his complaint do not rise to the level of injecting his prior mental and physical conditions into the case to the extent that he completely waives the physician-patient privilege.").

[¶86] To aid the district courts in determining whether a party's mental condition is sufficiently at issue, I would adopt the five-factor test used by numerous federal courts, and similar to the analysis made by the Colorado Supreme Court in their waiver cases, which would require courts to examine the claim for:

> (1) [T]he presence of a cause of action for intentional or negligent infliction of emotional distress;
> (2) [A]n allegation of a specific mental or psychiatric injury or disorder;
> (3) [A] claim of unusually severe emotional distress;
> (4) [A] proffer of expert testimony to support a claim of emotional distress; and/or
> (5) [A] concession by the plaintiff that his or her mental condition is in controversy.

*Porter v. Pinkerton Gov't Servs., Inc.*, 304 F.R.D. 24, 30–31 (D.D.C. 2014) (internal citation and quotation marks omitted); *see also and compare Langenfeld v. Armstrong World Indus., Inc.*, 299 F.R.D. 547, 552 (S.D. Ohio 2014); *Fitzgerald v. Cassil*, 216 F.R.D. 632, 637–38 (N.D. Cal. 2003); *Stevenson*, 201 F.R.D. at 554; *In re E.I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*, 379 F. Supp. 3d 669, 673 (S.D. Ohio 2019); *with Hoffman*, 87 P.3d at 864; *Weil*, 109 P.3d at 130–31; *Johnson*, 977 P.2d at 157; *Clark*, 668 P.2d at 10–11.

[¶87] A finding that any of these factors is present is generally sufficient to place the party's emotional damages claim beyond the realm of garden variety damages. *Kubik*, 2016 WL 4425174, at *5. "[W]here a party asserts that they have experienced emotional damages, but none of the five factors is implicated, that party has not placed their mental or emotional health 'at issue,' and discovery of those medical records should not be permitted." *Id.*

[¶88] Applying these factors to Ms. Vahai's claims, I would conclude that she did not place her mental health at issue. She requested damages for loss of enjoyment of life. Prior to trial, she represented she did not intend to seek any specific mental or emotional damages, she did not do so at trial, and the jury was specifically instructed that Ms. Vahai was not seeking mental or emotional damages.[18]

---

[18] After listing a request for damages for pain and suffering, loss of enjoyment of life, loss of earnings, future medical expenses, and future caretaking, the jury was instructed: "The Plaintiff is not claiming, and

[¶89]   In limiting her claims to garden variety damages, Ms. Vahai relinquished her ability to claim mental damages or damages resulting from a specific mental disorder or unusually severe distress.  Consequently, she was not able to use her psychotherapist-patient privilege as both sword and shield.  She held only the shield.

[¶90]   The majority's approach renders our privilege statutes a nullity by injecting the issue of mental anguish into every personal injury case in which loss of enjoyment of life is asserted.  *See St. John*, 274 F.R.D. at 18 ("we must supply a standard for determining whether a patient has waived the privilege . . . that does not eviscerate the privilege" (quoting *Koch*, 489 F.3d at 390)).  The majority's holding means that privilege will be waived routinely in any case where a plaintiff seeks recompense for the ordinary pain and suffering experienced, not only in personal injury cases but any civil action where pain and suffering results.  *See, e.g.*, *Sims*, 534 F.3d at 132–34 (analyzing waiver of psychotherapist-patient privilege in action for excessive force under 42 U.S.C. § 1983); *Porter*, 304 F.R.D. at 26–27 (plaintiff sued under 42 U.S.C. § 1981 for invasion of privacy, disparate treatment, hostile work environment, retaliation, and discrimination); *Awalt v. Marketti*, 287 F.R.D. 409, 411–19 (N.D. Ill. 2012) (analyzing waiver of psychotherapist-patient privilege in wrongful death case action); *Reda*, 765 N.E.2d at 1004–06 (analyzing waiver of the privilege in a medical malpractice claim).  It should be apparent that physical pain and suffering, absent mental anguish, can impair the enjoyment of life.  *Mariner v. Marsden*, 610 P.2d 6, 12, 15 (Wyo. 1980) ("[L]oss of enjoyment of life is a compensable damage . . . [and] the fact finder . . . may either make a separate award for loss of enjoyment of life or take into consideration the loss of enjoyment of life in arriving at the total general damages."  The evidence supporting the award for loss of enjoyment of life was that to "avoid or minimize pain, the plaintiff refrained from certain previously enjoyed activities."); *Werner Enterprises, Inc. v. Brophy*, 2009 WY 132, ¶¶ 76–79, 218 P.3d 948, 967 (Wyo. 2009) (finding the evidence sufficient to support an award for loss of enjoyment of life when it showed that plaintiff previously was a workaholic, went on yearly family vacations, played sports, cooked, took care of the house, and socialized and after the accident could not effectively communicate and relied on others for nearly every aspect of his daily care).

[¶91]   The notion that waiver of the statutory mental health privilege is implied where "the information sought may be relevant to a determination of the extent to which . . . mental suffering is properly attributable to the accident as opposed to some other cause [, is] . . . unpersuasive."  *Johnson*, 977 P.2d at 157.  It is the very nature of evidentiary privileges to "sacrifice some availability of evidence relevant to an administration of justice."  *Id.* (quoting 1 *McCormick on Evidence* § 72, at 269 (Charles T. McCormick et al. eds., 4th ed. 1992)).  "[R]elevance alone cannot be the test, because such a test would ignore the

---

you may not award any sum as damages for: . . . 2. Emotional distress, depression, anxiety, or any mental or emotional damage; . . . ."

31

fundamental purpose of evidentiary privileges, which is to preclude discovery and admission of relevant evidence under prescribed circumstances." *R.K. v. Ramirez*, 887 S.W.2d 836, 842 (Tex. 1994).

[¶92] I am persuaded by those courts that hold a plaintiff must do more than assert garden variety claims of mental or emotional distress or loss of enjoyment of life to waive the psychotherapist-patient privilege. That said, I cannot say the district court committed reversible error. While I would find the district court erred in requiring Ms. Vahai to disclose her substance abuse treatment records and admitting them at trial, the error was harmless given the substantial evidence supporting the jury's verdict. I concur in the result of the majority opinion.